Jacobs, J., filed a concurring opinion.
Cabranes, J., filed an opinion concurring in the judgment.
Sack, J., filed a concurring opinion.
Lohier, J., filed a concurring opinion.
Lynch, J., filed a dissenting opinion in which Livingston, J., joined as to Parts I, II, and III.
Livingston, J., filed a dissenting opinion.
Raggi, J., filed a dissenting opinion.
Katzmann, Chief Judge:
*107 Donald Zarda,[1] a skydiving instructor, brought a sex discrimination claim under Title VII of the Civil Rights Act of 1964 ("Title VII") alleging that he was fired from his job at Altitude Express, Inc., because he failed to conform to male sex stereotypes by referring to his sexual orientation. Although it is well-settled that gender stereotyping violates Title VII's prohibition on discrimination "because of ... sex," we have previously held that sexual orientation discrimination claims, including claims that being gay or lesbian constitutes nonconformity with a gender stereotype, are not cognizable under Title VII.[2] See Simonton v. Runyon , 232 F.3d 33, 35 (2d Cir. 2000) ; see also Dawson v. Bumble & Bumble , 398 F.3d 211, 217-23 (2d Cir. 2005).
At the time Simonton and Dawson were decided, and for many years since, this view was consistent with the consensus among our sister circuits and the position of the Equal Employment Opportunity Commission ("EEOC" or "Commission"). See, e.g. , Kalich v. AT&T Mobility, LLC , 679 F.3d 464, 471 (6th Cir. 2012) ; Prowel v. Wise Bus. Forms, Inc. , 579 F.3d 285, 289 (3d Cir. 2009) ; Medina v.Income Support Div. , 413 F.3d 1131, 1135 (10th Cir. 2005) ; Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc. , 224 F.3d 701, 704 (7th Cir. 2000) ; Higgins v. New Balance Athletic Shoe, Inc. , 194 F.3d 252, 259 (1st Cir. 1999) ;[3] Wrightson v. Pizza Hut of Am., Inc. , 99 F.3d 138, 143 (4th Cir. 1996) ; Williamson v. A.G. Edwards & Sons, Inc. , 876 F.2d 69, 70 (8th Cir. 1989) (per curiam); Blum v. Gulf Oil Corp. , 597 F.2d 936, 938 (5th Cir. 1979) (per curiam); see also Johnson v. Frank , EEOC Decision No. 01911827, 1991 WL 1189760, at *3 (Dec. 19, 1991). But legal doctrine evolves and in 2015 the EEOC held, for the first time, that "sexual orientation is inherently a 'sex-based consideration;' accordingly an allegation of discrimination based on sexual orientation is necessarily an allegation of sex discrimination under Title VII." Baldwin v. Foxx , EEOC Decision No. 0120133080, 2015 WL 4397641, at *5 (July 15, 2015) (quoting *108 Price Waterhouse v. Hopkins , 490 U.S. 228, 242, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion) ). Since then, two circuits have revisited the question of whether claims of sexual orientation discrimination are viable under Title VII. In March 2017, a divided panel of the Eleventh Circuit declined to recognize such a claim, concluding that it was bound by Blum , 597 F.2d at 938, which "ha[s] not been overruled by a clearly contrary opinion of the Supreme Court or of [the Eleventh Circuit] sitting en banc ." Evans v. Ga. Reg'l Hosp. , 850 F.3d 1248, 1257 (11th Cir.), cert. denied , --- U.S. ----, 138 S.Ct. 557, 199 L.Ed.2d 446 (2017). One month later, the Seventh Circuit, sitting en banc, took "a fresh look at [its] position in light of developments at the Supreme Court extending over two decades" and held that "discrimination on the basis of sexual orientation is a form of sex discrimination." Hively , 853 F.3d at 340-41. In addition, a concurring opinion of this Court recently called "for the Court to revisit" this question, emphasizing the "changing legal landscape that has taken shape in the nearly two decades since Simonton issued," and identifying multiple arguments that support the conclusion that sexual orientation discrimination is barred by Title VII. Christiansen v. Omnicom Grp., Inc. , 852 F.3d 195, 202 (2d Cir. 2017) (Katzmann, C.J. , concurring) ("Christiansen and amici advance three arguments, none previously addressed by this Court ...."); see also id. at 204 ("Neither Simonton nor Dawson addressed [the but-for] argument.").
Taking note of the potential persuasive force of these new decisions, we convened en banc to reevaluate Simonton and Dawson in light of arguments not previously considered by this Court. Having done so, we now hold that Title VII prohibits discrimination on the basis of sexual orientation as discrimination "because of ... sex." To the extent that our prior precedents held otherwise, they are overruled.
We therefore VACATE the district court's judgment on Zarda's Title VII claim and REMAND for further proceedings consistent with this opinion. We AFFIRM the judgment of the district court in all other respects.
BACKGROUND
The facts and procedural history of this case are discussed in detail in our prior panel decision. See Zarda v. Altitude Express , 855 F.3d 76, 79-81 (2d Cir. 2017). We recite them only as necessary to address the legal question under consideration.
In the summer of 2010, Donald Zarda, a gay man, worked as a sky-diving instructor at Altitude Express. As part of his job, he regularly participated in tandem skydives, strapped hip-to-hip and shoulder-to-shoulder with clients. In an environment where close physical proximity was common, Zarda's co-workers routinely referenced sexual orientation or made sexual jokes around clients, and Zarda sometimes told female clients about his sexual orientation to assuage any concern they might have about being strapped to a man for a tandem skydive. That June, Zarda told a female client with whom he was preparing for a tandem skydive that he was gay "and ha[d] an ex-husband to prove it." J.A. 400 ¶ 23. Although he later said this disclosure was intended simply to preempt any discomfort the client may have felt in being strapped to the body of an unfamiliar man, the client alleged that Zarda inappropriately touched her and disclosed his sexual orientation to excuse his behavior. After the jump was successfully completed, the client told her boyfriend about Zarda's alleged behavior and reference to his sexual orientation; the boyfriend in turn told Zarda's boss, who fired shortly Zarda thereafter.
*109 Zarda denied inappropriately touching the client and insisted he was fired solely because of his reference to his sexual orientation.
One month later, Zarda filed a discrimination charge with the EEOC concerning his termination. Zarda claimed that "in addition to being discriminated against because of [his] sexual orientation, [he] was also discriminated against because of [his] gender." Special Appendix ("S.A.") 3. In particular, he claimed that "[a]ll of the men at [his workplace] made light of the intimate nature of being strapped to a member of the opposite sex," but that he was fired because he "honestly referred to [his] sexual orientation and did not conform to the straight male macho stereotype." S.A. 5.
In September 2010, Zarda brought a lawsuit in federal court alleging, inter alia , sex stereotyping in violation of Title VII and sexual orientation discrimination in violation of New York law. Defendants moved for summary judgment arguing that Zarda's Title VII claim should be dismissed because, although "Plaintiff testifie[d] repeatedly that he believe[d] the reason he was terminated [was] because of his sexual orientation ... [,] under Title VII, a gender stereotype cannot be predicated on sexual orientation." Dist. Ct. Dkt. No. 109 at 3 (citing Simonton , 232 F.3d at 35 ). In March 2014, the district court granted summary judgment to the defendants on the Title VII claim. As relevant here, the district court concluded that, although there was sufficient evidence to permit plaintiff to proceed with his claim for sexual orientation discrimination under New York law, plaintiff had failed to establish a prima facie case of gender stereotyping discrimination under Title VII.
While Zarda's remaining claims were still pending, the EEOC decided Baldwin , holding that "allegations of discrimination on the basis of sexual orientation necessarily state a claim of discrimination on the basis of sex." 2015 WL 4397641 at *10. The Commission identified three ways to illustrate what it described as the "inescapable link between allegations of sexual orientation discrimination and sex discrimination." Id. at *5. First, sexual orientation discrimination, such as suspending a lesbian employee for displaying a photo of her female spouse on her desk while not suspending a man for displaying a photo of his female spouse, "is sex discrimination because it necessarily entails treating an employee less favorably because of the employee's sex." Id. Second, it is "associational discrimination" because "an employee alleging discrimination on the basis of sexual orientation is alleging that his or her employer took his or her sex into account by treating him or her differently for associating with a person of the same sex." Id. at *6. Lastly, sexual orientation discrimination "necessarily involves discrimination based on gender stereotypes," most commonly "heterosexually defined gender norms." Id. at *7-8 (internal quotation marks omitted). Shortly thereafter, Zarda moved to have his Title VII claim reinstated based on Baldwin . But, the district court denied the motion, concluding that Simonton remained binding precedent.
Zarda's surviving claims, which included his claim for sexual orientation discrimination under New York law, went to trial, where defendants prevailed. After judgment was entered for the defendants, Zarda appealed. As relevant here, Zarda argued that Simonton should be overturned because the EEOC's reasoning in Baldwin demonstrated that Simonton was incorrectly decided. By contrast, defendants argued that the court did not need to reach that issue because the jury found that they *110 had not discriminated based on sexual orientation.
The panel held that "Zarda's [federal] sex-discrimination claim [was] properly before [it] because [his state law claim was tried under] a higher standard of causation than required by Title VII." Zarda , 855 F.3d at 81. However, the panel "decline[d] Zarda's invitation to revisit our precedent," which "can only be overturned by the entire Court sitting in banc." Id. at 82. The Court subsequently ordered this rehearing en banc to revisit Simonton and Dawson 's holdings that claims of sexual orientation discrimination are not cognizable under Title VII.
DISCUSSION
I. Jurisdiction
We first address the defendants' challenge to our jurisdiction. Article III of the Constitution grants federal courts the authority to hear only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. As a result, "a federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.' " Preiser v. Newkirk , 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) (quoting North Carolina v. Rice , 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) ). The defendants argue that any decision on the merits would be an advisory opinion because Zarda did not allege sexual orientation discrimination in his EEOC charge or his federal complaint and therefore the question of whether Title VII applies to sexual orientation discrimination is not properly before us.
Irrespective of whether defendants' argument is actually jurisdictional,[4] its factual premises are patently contradicted by both the record and the position defendants advanced below. Zarda's EEOC complaint explained that he was "making this charge because, in addition to being discriminated against because of [his] sexual orientation, [he] was also discriminated against because of [his] gender." S.A. 3.[5] Zarda specified that his supervisor "was hostile to any expression of [his] sexual orientation that did not conform to sex stereotypes," and alleged that he "was fired ... because ... [he] honestly referred to [his] sexual orientation and *111 did not conform to the straight male macho stereotype." S.A. 3, 5. Zarda repeated this claim in his federal complaint, contending that he was "an openly gay man" who was "discharge[ed] because of a homophobic customer" and "because his behavior did not conform to sex stereotypes," in violation of Title VII. J.A. 65, 69, 75.
Defendants plainly understood Zarda's complaint to have raised a claim for sexual orientation discrimination under Title VII. In their motion for summary judgment, defendants argued that Zarda's claim "relies on the fact that Plaintiff is homosexual, not that he failed to comply with male gender norms. Thus, Plaintiff[ ] merely attempts to bring a defective sexual orientation claim under Title VII, which is legally invalid." Dist. Ct. Dkt. No. 109 at 9 (citing Dawson , 398 F.3d at 221 ). The district court ultimately agreed.
Having interpreted Zarda's Title VII claim as one for sexual orientation discrimination for purposes of insisting that the claim be dismissed, defendants cannot now argue that there is no sexual orientation claim to prevent this Court from reviewing the basis for the dismissal. Both defendants and the district court clearly understood that Zarda had alleged sexual orientation discrimination under Title VII. As a result, Zarda's Title VII claim is neither unexhausted nor unpled, and so it may proceed.[6]
II. Sexual Orientation Discrimination
A. The Scope of Title VII
"In passing Title VII, Congress made the simple but momentous announcement that sex, race, religion, and national origin are not relevant to the selection, evaluation, or compensation of employees." Price Waterhouse , 490 U.S. at 239, 109 S.Ct. 1775. The text of Title VII provides, in relevant part:
It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge ... or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ....
42 U.S.C. § 2000e-2(a)(1). This "broad rule of workplace equality," Harris v. Forklift Sys., Inc. , 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), "strike[s] at the entire spectrum of disparate treatment" based on protected characteristics, L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) (quoting Sprogis v. United Air Lines, Inc. , 444 F.2d 1194, 1198 (7th Cir. 1971) ), "regardless of whether the discrimination is directed against majorities or minorities," Trans World Airlines, Inc. v. Hardison , 432 U.S. 63, 71-72, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). As a result, we have stated that "Title VII should be interpreted broadly to achieve equal employment opportunity." Huntington Branch, N.A.A.C.P. v. Town of Huntington , 844 F.2d 926, 935 (2d Cir. 1988) (citing Griggs v. Duke Power Co. , 401 U.S. 424, 429-36, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) ).
In deciding whether Title VII prohibits sexual orientation discrimination, we are guided, as always, by the text and, in particular, by the phrase "because of ...
*112 sex." However, in interpreting this language, we do not write on a blank slate. Instead, we must construe the text in light of the entirety of the statute as well as relevant precedent. As defined by Title VII, an employer has engaged in "impermissible consideration of ... sex ... in employment practices" when "sex ... was a motivating factor for any employment practice," irrespective of whether the employer was also motivated by "other factors." 42 U.S.C. § 2000e-2(m). Accordingly, the critical inquiry for a court assessing whether an employment practice is "because of ... sex" is whether sex was "a motivating factor." Rivera v. Rochester Genesee Reg'l Transp. Auth. , 743 F.3d 11, 23 (2d Cir. 2014).
Recognizing that Congress intended to make sex "irrelevant" to employment decisions, Griggs , 401 U.S. at 436, 91 S.Ct. 849, the Supreme Court has held that Title VII prohibits not just discrimination based on sex itself, but also discrimination based on traits that are a function of sex, such as life expectancy, Manhart, 435 U.S. at 711, 98 S.Ct. 1370, and non-conformity with gender norms, Price Waterhouse , 490 U.S. at 250-51, 109 S.Ct. 1775. As this Court has recognized, "any meaningful regime of antidiscrimination law must encompass such claims" because, if an employer is " '[f]ree to add non-sex factors, the rankest sort of discrimination' " could be worked against employees by using traits that are associated with sex as a proxy for sex. Back v. Hastings On Hudson Union Free Sch. Dist. , 365 F.3d 107, 119 n.9 (2d Cir. 2004) (quoting Phillips v. Martin Marietta Corp. , 416 F.2d 1257, 1260 (5th Cir. 1969) (Brown, C.J. , dissenting from denial of rehearing en banc) ). Applying Title VII to traits that are a function of sex is consistent with the Supreme Court's view that Title VII covers not just "the principal evil[s] Congress was concerned with when it enacted" the statute in 1964, but also "reasonably comparable evils" that meet the statutory requirements. Oncale v. Sundowner Offshore Servs., Inc ., 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).
With this understanding in mind, the question before us is whether an employee's sex is necessarily a motivating factor in discrimination based on sexual orientation. If it is, then sexual orientation discrimination is properly understood as "a subset of actions taken on the basis of sex." Hively , 853 F.3d at 343.[7]
B. Sexual Orientation Discrimination as a Subset of Sex Discrimination
We now conclude that sexual orientation discrimination is motivated, at least in part, by sex and is thus a subset of sex discrimination. Looking first to the text of Title VII, the most natural reading of the statute's prohibition on discrimination "because of ... sex" is that it extends to sexual orientation discrimination because sex is necessarily a factor in sexual orientation. This statutory reading is reinforced by considering the question from the perspective of sex stereotyping because sexual orientation discrimination is predicated on assumptions about how persons of a certain sex can or should be, which is an impermissible basis for adverse employment actions. In addition, looking at the question from the perspective of associational discrimination, sexual orientation discrimination-which is motivated by an *113 employer's opposition to romantic association between particular sexes-is discrimination based on the employee's own sex.
1. Sexual Orientation as a Function of Sex
a. "Because of ... sex"
We begin by considering the nature of sexual orientation discrimination. The term "sexual orientation" refers to "[a] person's predisposition or inclination toward sexual activity or behavior with other males or females" and is commonly categorized as "heterosexuality, homosexuality, or bisexuality." See Sexual Orientation , Black's Law Dictionary (10th ed. 2014). To take one example, "homosexuality" is "characterized by sexual desire for a person of the same sex." Homosexual , id. ; see also Heterosexual , id. ("Of, relating to, or characterized by sexual desire for a person of the opposite sex."); Bisexual , id. ("Of, relating to, or characterized by sexual desire for both males and females."). To operationalize this definition and identify the sexual orientation of a particular person, we need to know the sex of the person and that of the people to whom he or she is attracted. Hively , 853 F.3d at 358 (Flaum, J. , concurring) ("One cannot consider a person's homosexuality without also accounting for their sex: doing so would render 'same' [sex] ... meaningless."). Because one cannot fully define a person's sexual orientation without identifying his or her sex, sexual orientation is a function of sex. Indeed sexual orientation is doubly delineated by sex because it is a function of both a person's sex and the sex of those to whom he or she is attracted. Logically, because sexual orientation is a function of sex and sex is a protected characteristic under Title VII, it follows that sexual orientation is also protected. See id. ("[D]iscriminating against [an] employee because they are homosexual constitutes discriminating against an employee because of (A) the employee's sex, and (B) their sexual attraction to individuals of the same sex .").[8]
Choosing not to acknowledge the sex-dependent nature of sexual orientation, certain amici contend that employers discriminating on the basis of sexual orientation can do so without reference to sex.[9] In support of this assertion, they point to Price Waterhouse , where the Supreme Court observed that one way to discern the motivation behind an employment decision is to consider whether, "if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be" the applicant or employee's sex. 490 U.S. at 250, 109 S.Ct. 1775. Relying on this language, these amici argue that a "truthful" response to an inquiry about why an employee was fired would be "I fired him because he is gay," not "I fired him because he is a man." But this semantic sleight of hand is not a defense; it is a distraction. The employer's failure to reference gender directly does not change the fact that a "gay" employee is simply a man who is attracted to men.
*114 For purposes of Title VII, firing a man because he is attracted to men is a decision motivated, at least in part, by sex. More broadly, were this Court to credit amici 's argument, employers would be able to rebut a discrimination claim by merely characterizing their action using alternative terminology. Title VII instructs courts to examine employers' motives, not merely their choice of words. See 42 U.S.C. § 2000e-2(m). As a result, firing an employee because he is "gay" is a form of sex discrimination.[10]
The argument has also been made that it is not "even remotely plausible that in 1964, when Title VII was adopted, a reasonable person competent in the English language would have understood that a law banning employment discrimination 'because of sex' also banned discrimination because of sexual orientation[.]" Hively , 853 F.3d at 362 (Sykes, J ., dissenting). Even if that were so, the same could also be said of multiple forms of discrimination that are indisputably prohibited by Title VII, as the Supreme Court and lower courts have determined. Consider, for example, sexual harassment and hostile work environment claims, both of which were initially believed to fall outside the scope of Title VII's prohibition.
In 1974, a district court dismissed a female employee's claim for sexual harassment reasoning that "[t]he substance of [her] complaint [was] that she was discriminated against, not because she was a woman, but because she refused to engage in a sexual affair with her supervisor." Barnes v. Train , No. 1828-73, 1974 WL 10628, at *1 (D.D.C. Aug. 9, 1974). The district court concluded that this conduct, although "inexcusable," was "not encompassed by [Title VII]." Id. The D.C. Circuit reversed. Unlike the district court, it recognized that the plaintiff "became the target of her supervisor's sexual desires because she was a woman ." Barnes v. Costle , 561 F.2d 983, 990 (D.C. Cir. 1977) (emphasis added). As a result the D.C. Circuit held that "gender cannot be eliminated from [plaintiff's formulation of her claim] and that formulation advances a prima facie case of sex discrimination within the purview of Title VII" because "it is enough that gender is a factor contributing to the discrimination." Id . Today, the Supreme Court and lower courts "uniformly" recognize sexual harassment claims as a violation of Title VII, see, e.g. , Meritor Sav. Bank, FSB v. Vinson , 477 U.S. 57, 66-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), notwithstanding the fact that, as evidenced by the district court decision in Barnes , this was not necessarily obvious from the face of the statute.
The Supreme Court has also acknowledged that a "hostile work environment," although it "do[es] not appear in the statutory text," Burlington Indus., Inc. v. Ellerth , 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), violates Title VII by affecting the "psychological aspects of the workplace environment," Meritor , 477 U.S. at 64, 106 S.Ct. 2399 (internal quotation marks omitted). As Judge Goldberg, one of the early proponents of hostile work environment claims, explained in a case involving national origin discrimination,
[Title VII's] language evinces a Congressional intention to define discrimination in the broadest possible terms. Congress chose neither to enumerate specific discriminatory practices, nor to elucidate in extenso the parameter of *115 such nefarious activities. Rather, it pursued the path of wisdom by being unconstrictive, knowing that constant change is the order of our day and that the seemingly reasonable practices of the present can easily become the injustices of the morrow.
Rogers v. E.E.O.C. , 454 F.2d 234, 238 (5th Cir. 1971). Stated differently, because Congress could not anticipate the full spectrum of employment discrimination that would be directed at the protected categories, it falls to courts to give effect to the broad language that Congress used. See Pullman-Standard v. Swint , 456 U.S. 273, 276, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) ("Title VII is a broad remedial measure, designed 'to assure equality of employment opportunities.' " (quoting McDonnell Douglas Corp. v. Green , 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ) ).
The Supreme Court gave voice to this principle of construction when it held that Title VII barred male-on-male sexual harassment, which "was assuredly not the principal evil Congress was concerned with when it enacted Title VII," Oncale , 523 U.S. at 79-80, 118 S.Ct. 998, and which few people in 1964 would likely have understood to be covered by the statutory text. But the Court was untroubled by these facts. "[S]tatutory prohibitions," it explained, "often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." Id. Applying this reasoning to the question at hand, the fact that Congress might not have contemplated that discrimination "because of ... sex" would encompass sexual orientation discrimination does not limit the reach of the statute.
The dissent disagrees with this conclusion. It does not dispute our definition of the word "sex," Lead Dissent at 145, nor does it argue that this word had a different meaning in 1964. Instead, it charges us with "misconceiv[ing] the fundamental public meaning of the language of" Title VII. Id. at 143 (emphasis omitted). According to the dissent, the drafters included "sex" in Title VII to "secure the rights of women to equal protection in employment," id. at 145, and had no intention of prohibiting sexual orientation discrimination, id. at 142-43. We take no position on the substance of the dissent's discussion of the legislative history or the zeitgeist of the 1960s, but we respectfully disagree with its approach to interpreting Title VII as well as its conclusion that sexual orientation discrimination is not a "reasonably comparable evil," Oncale , 523 U.S. at 79, 118 S.Ct. 998, to sexual harassment and male-on-male harassment. Although legislative history most certainly has its uses, in ascertaining statutory meaning in a Title VII case, Oncale specifically rejects reliance on "the principal concerns of our legislators," id. at 79-80, 118 S.Ct. 998 -the centerpiece of the dissent's statutory analysis. Rather, Oncale instructs that the text is the lodestar of statutory interpretation, emphasizing that we are governed "by the provisions of our laws." Id. The text before us uses broad language, prohibiting discrimination "because of ... sex," which Congress defined as making sex "a motivating factor." 42 U.S.C. §§ 2000e-2(a)(1), 2000e-2(m). We give these words their full scope and conclude that, because sexual orientation discrimination is a function of sex, and is comparable to sexual harassment, gender stereotyping, and other evils long recognized as violating Title VII, the statute must prohibit it.[11]
*116 b. "But for" an Employee's Sex
Our conclusion is reinforced by the Supreme Court's test for determining whether an employment practice constitutes sex discrimination. This approach, which we call the "comparative test," determines whether the trait that is the basis for discrimination is a function of sex by asking whether an employee's treatment would have been different "but for that person's sex." Manhart , 435 U.S. at 711, 98 S.Ct. 1370 (internal quotation marks omitted). To illustrate its application to sexual orientation, consider the facts of the recent Seventh Circuit case addressing a Title VII claim brought by Kimberly Hively, a lesbian professor who alleged that she was denied a promotion because of her sexual orientation. Hively , 853 F.3d at 341 (majority). Accepting that allegation as true at the motion-to-dismiss stage, the Seventh Circuit compared Hively, a female professor attracted to women (who was denied a promotion), with a hypothetical scenario in which Hively was a male who was attracted to women (and received a promotion). Id. at 345. Under this scenario, the Seventh Circuit concluded that, as alleged, Hively would not have been denied a promotion but for her sex, and therefore sexual orientation is a function of sex. From this conclusion, it follows that sexual orientation discrimination is a subset of sex discrimination. Id.
The government,[12] drawing from the dissent in Hively , argues that this is an improper comparison. According to this argument, rather than "hold[ing] everything constant except the plaintiff's sex" the Hively majority's comparison changed "two variables-the plaintiff's sex and sexual orientation." 853 F.3d at 366 (Sykes, J. , dissenting). In other words, the Seventh Circuit compared a lesbian woman with a heterosexual man. As an initial matter, this observation helpfully illustrates that sexual orientation is a function of sex. In the comparison, changing Hively's sex changed her sexual orientation. Case in point.
But the real issue raised by the government's critique is the proper application of the comparative test. In the government's view, the appropriate comparison is not between a woman attracted to women and a man attracted to women; it's between a woman and a man, both of whom are attracted to people of the same sex. Determining which of these framings is correct requires understanding the purpose and operation of the comparative test. Although the Supreme Court has not elaborated on the role that the test plays in Title VII jurisprudence, based on how the Supreme Court has employed the test, we understand that its purpose is to determine when a trait other than sex is, in fact, a proxy for (or a function of) sex. To determine whether a trait is such a proxy, the test compares a female and a male *117 employee who both exhibit the trait at issue. In the comparison, the trait is the control, sex is the independent variable, and employee treatment is the dependent variable.
To understand how the test works in practice, consider Manhart . There, the Supreme Court evaluated the Los Angeles Department of Water's requirement that female employees make larger pension contributions than their male colleagues. 435 U.S. at 704-05, 98 S.Ct. 1370. This requirement was based on mortality data indicating that female employees outlived male employees by several years and the employer insisted that "the different contributions exacted from men and women were based on the factor of longevity rather than sex." Id. at 712, 98 S.Ct. 1370. Applying "the simple test of whether the evidence shows treatment of a person in a manner which but for that person's sex would be different," the Court compared a woman and a man, both of whose pension contributions were based on life expectancy, and asked whether they were required to make different contributions. Id. at 711, 98 S.Ct. 1370 (internal quotation marks omitted). Importantly, because life expectancy is a sex-dependent trait, changing the sex of the employee (the independent variable) necessarily affected the employee's life expectancy and thereby changed how they were impacted by the pension policy (the dependent variable). After identifying this correlation, the Court concluded that life expectancy was simply a proxy for sex and therefore the pension policy constituted discrimination "because of ... sex." Id.
We can also look to the Supreme Court's decision in Price Waterhouse. Although that case did not quote Manhart 's "but for" language, it involved a similar inquiry: in determining whether discrimination based on particular traits was rooted in sex stereotypes, the Supreme Court asked whether a female accountant would have been denied a promotion based on her aggressiveness and failure to wear jewelry and makeup "if she had been a man." 490 U.S. at 258, 109 S.Ct. 1775. Otherwise said, the Supreme Court compared a man and a woman who exhibited the plaintiff's traits and asked whether they would have experienced different employment outcomes. Notably, being aggressive and not wearing jewelry or makeup is consistent with gender stereotypes for men. Therefore, by changing the plaintiff's gender, the Supreme Court also changed the plaintiff's gender non-conformity.
The government's proposed approach to Hively , which would compare a woman attracted to people of the same sex with a man attracted to people of the same sex, adopts the wrong framing. To understand why this is incorrect, consider the mismatch between the facts in the government's comparison and the allegation at issue: Hively did not allege that her employer discriminated against women with same-sex attraction but not men with same-sex attraction. If she had, that would be classic sex discrimination against a subset of women. See Lead Dissent at 152 n.20. Instead, Hively claimed that her employer discriminated on the basis of sexual orientation. To address that allegation, the proper question is whether sex is a "motivating factor" in sexual orientation discrimination, see 42 U.S.C. § 2000e-2(m), or, said more simply, whether sexual orientation is a function of sex.[13] But, contrary *118 to the government's suggestion, this question cannot be answered by comparing two people with the same sexual orientation. That would be equivalent to comparing the gender non-conforming female plaintiff in Price Waterhouse to a gender non-conforming man; such a comparison would not illustrate whether a particular stereotype is sex dependent but only whether the employer discriminates against gender non-conformity in only one gender. Instead, just as Price Waterhouse compared a gender non-conforming woman to a gender conforming man, both of whom were aggressive and did not wear makeup or jewelry, the Hively court properly determined that sexual orientation is sex dependent by comparing a woman and a man with two different sexual orientations, both of whom were attracted to women.
The government further counters that the comparative test produces false positives in instances where it is permissible to impose different terms of employment on men and women because "the sexes are not similarly situated." Gov. Br. at 16-17 (quoting Michael M. v. Superior Court of Sonoma Cty. , 450 U.S. 464, 469, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) ).[14] For example, the government posits that courts have rejected the comparative test when assessing employer policies regarding sex-segregated bathrooms and different grooming standards for men and women. Similarly, the lead dissent insists that our holding would preclude such policies if "[t]aken to its logical conclusion." Lead Dissent at 151. Both criticisms are misplaced.
A plaintiff alleging disparate treatment based on sex in violation of Title VII must show two things: (1) that he was "discriminate[d] against ... with respect to his compensation, terms, conditions, or privileges of employment," and (2) that the employer discriminated "because of ... sex." 42 U.S.C. § 2000e-2(a)(1). The comparative test addresses the second prong of that test; it reveals whether an employment practice is "because of ... sex" by asking whether the trait at issue (life expectancy, sexual orientation, etc.) is a function of sex. In contrast, courts that have addressed challenges to the sex-specific employment practices identified by the government have readily acknowledged that the policies are based on sex and instead focused their analysis on the first prong: whether the policies impose "disadvantageous terms or conditions of employment."[15]
*119 Harris , 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J. , concurring); see, e.g. , Jespersen v. Harrah's Operating Co. , 444 F.3d 1104, 1109-10 (9th Cir. 2006) (upholding grooming standards that do not "place[ ] a greater burden on one gender than the other"); Knott v. Mo. Pac. R.R. Co. , 527 F.2d 1249, 1252 (8th Cir. 1975) (concluding that "slight differences in the appearance requirements for males and females have only a negligible effect on employment opportunities"); Willingham v. Macon Tel. Publ'g Co. , 507 F.2d 1084, 1092 (5th Cir. 1975) (same); Dodge v. Giant Food, Inc. , 488 F.2d 1333, 1336-37 (D.C. Cir. 1973) (holding that hair-length regulations, like "the requirement that men and women use separate toilet facilities[,] ... do not pose distinct employment disadvantages for one sex").[16] Whether sex-specific bathroom and grooming policies impose disadvantageous terms or conditions is a separate question from this Court's inquiry into whether sexual orientation discrimination is "because of ... sex," and has no bearing on the efficacy of the comparative test.
Having addressed the proper application of the comparative test, we conclude that the law is clear: To determine whether a trait operates as a proxy for sex, we ask whether the employee would have been treated differently "but for" his or her sex. In the context of sexual orientation, a woman who is subject to an adverse employment action because she is attracted to women would have been treated differently if she had been a man who was attracted to women. We can therefore conclude that sexual orientation is a function of sex and, by extension, sexual orientation discrimination is a subset of sex discrimination.[17]
2. Gender Stereotyping
Viewing the relationship between sexual orientation and sex through the lens of gender stereotyping provides yet another basis for concluding that sexual orientation discrimination is a subset of sex discrimination. Specifically, this framework demonstrates that sexual orientation discrimination is almost invariably rooted in stereotypes about men and women.
Since 1978, the Supreme Court has recognized that "employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females," because Title VII "strike[s] at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Manhart , 435 U.S. at 707 & n.13, 98 S.Ct. 1370. This is true of stereotypes about both how the sexes are and how they should be. Price Waterhouse , 490 U.S. at 250, 109 S.Ct. 1775 ("[A]n employer who acts on the basis of a belief that a woman cannot ... or must not [possess certain traits] has acted *120 on the basis of gender."); see also Zachary R. Herz, Note, Price's Progress: Sex Stereotyping and Its Potential for Antidiscrimination Law , 124 Yale L.J. 396, 405-06 (2014) (distinguishing between ascriptive stereotypes that "treat[ ] a large group of people alike" and prescriptive stereotypes that speak to how members of a group should be).
In Price Waterhouse , the Supreme Court concluded that adverse employment actions taken based on the belief that a female accountant should walk, talk, and dress femininely constituted impermissible sex discrimination. See 490 U.S. at 250-52, 109 S.Ct. 1775 (plurality); see also id . at 259, 109 S.Ct. 1775 (White, J ., concurring in the judgment); id . at 272-73, 109 S.Ct. 1775 (O'Connor, J ., concurring in the judgment).[18] Similarly, Manhart stands for the proposition that "employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females," and held that female employees could not, by virtue of their status as women, be discriminated against based on the gender stereotype that women generally outlive men. 435 U.S. at 707-08, 711, 98 S.Ct. 1370. Under these principles, employees who experience adverse employment actions as a result of their employer's generalizations about members of their sex, id. at 708, 98 S.Ct. 1370, or "as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim under Title VII," Dawson , 398 F.3d at 218.
Accepting that sex stereotyping violates Title VII, the "crucial question" is "[w]hat constitutes a gender-based stereotype." Back , 365 F.3d at 119-20. As demonstrated by Price Waterhouse , one way to answer this question is to ask whether the employer who evaluated the plaintiff in "sex-based terms would have criticized her as sharply (or criticized her at all) if she had been a man." 490 U.S. at 258, 109 S.Ct. 1775. Similarly, this Court has observed that the question of whether there has been improper reliance on sex stereotypes can sometimes be answered by considering whether the behavior or trait at issue would have been viewed more or less favorably if the employee were of a different sex. See Back , 365 F.3d at 120 n.10 (quoting Doe ex rel. Doe v. City of Belleville, 119 F.3d 563, 581-82 (7th Cir. 1997) ).[19]
Applying Price Waterhouse 's reasoning to sexual orientation, we conclude that when, for example, "an employer ... acts on the basis of a belief that [men] cannot be [attracted to men], or that [they] must not be," but takes no such action against women who are attracted to men, *121 the employer "has acted on the basis of gender." Cf. 490 U.S. at 250, 109 S.Ct. 1775.[20] This conclusion is consistent with Hively 's holding that same-sex orientation "represents the ultimate case of failure to conform" to gender stereotypes, 853 F.3d at 346 (majority), and aligns with numerous district courts' observation that "stereotypes about homosexuality are directly related to our stereotypes about the proper roles of men and women. ... The gender stereotype at work here is that 'real' men should date women, and not other men," Centola v. Potter , 183 F.Supp.2d 403, 410 (D. Mass. 2002) ; see also, e.g., Boutillier v. Hartford Pub. Sch. , 221 F.Supp.3d 255, 269 (D. Conn. 2016) ; Videckis v. Pepperdine Univ. , 150 F.Supp.3d 1151, 1160 (C.D. Cal. 2015) ; Terveer v. Billington , 34 F.Supp.3d 100, 116 (D.D.C. 2014) ; Heller v. Columbia Edgewater Country Club , 195 F.Supp.2d 1212, 1224 (D. Or. 2002).[21]
This conclusion is further reinforced by the unworkability of Simonton and Dawson 's holding that sexual orientation discrimination is not a product of sex stereotypes. Lower courts operating under this standard have long labored to distinguish between gender stereotypes that support an inference of impermissible sex discrimination and those that are indicative of sexual orientation discrimination. See generally Hively v. Ivy Tech Cmty. Coll., S. Bend , 830 F.3d 698, 705-09 (7th Cir. 2016) (panel op.) (collecting cases), vacated by Hively , 853 F.3d 339 (en banc). Under this approach "a woman might have a Title VII claim if she was harassed or fired for being perceived as too 'macho' but not if she was harassed or fired for being perceived as a lesbian." Fabian v. Hosp. of Cent. Conn. , 172 F.Supp.3d 509, 524 n.8 (D. Conn. 2016). In parsing the evidence, courts have resorted to lexical bean counting, comparing the relative frequency of epithets such as "ass wipe," "fag," "gay," "queer," "real man," and "fem" to determine whether discrimination is based on sex or sexual orientation. See, e.g. , Kay v. Indep. Blue Cross , 142 Fed.Appx. 48, 51 (3d Cir. 2005). Claims of gender discrimination have been "especially difficult for gay plaintiffs to bring," Maroney v. Waterbury Hosp. , No. 3:10-CV-1415, 2011 WL 1085633, at *2 n.2 (D. Conn. Mar. 18, 2011), because references to a plaintiff's sexual orientation are generally excluded from the evidence, Boutillier , 221 F.Supp.3d at 269, or permitted only when "the harassment consists of homophobic *122 slurs directed at a heterosexual ," Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist. , 169 F.Supp.3d 320, 332-33 (N.D.N.Y. 2016) (emphasis added). But see Franchina , 881 F.3d at 53 (holding that jury may consider evidence referencing plaintiff's sexual orientation for purposes of a sex discrimination claim). Unsurprisingly, many courts have found these distinctions unworkable, admitting that the doctrine is "illogical," Philpott v. New York , 252 F.Supp.3d 313, 316 (S.D.N.Y. 2017), and produces "untenable results," Boutillier , 221 F.Supp.3d at 270. In the face of this pervasive confusion, we are persuaded that "the line between sex discrimination and sexual orientation discrimination is 'difficult to draw' because that line does not exist save as a lingering and faulty judicial construct." Videckis , 150 F.Supp.3d at 1159 (quoting Prowel , 579 F.3d at 291 ). We now conclude that sexual orientation discrimination is rooted in gender stereotypes and is thus a subset of sex discrimination.
The government resists this conclusion, insisting that negative views of those attracted to members of the same sex may not be based on views about gender at all, but may be rooted in "moral beliefs about sexual, marital and familial relationships." Gov. Br. at 19. But this argument merely begs the question by assuming that moral beliefs about sexual orientation can be dissociated from beliefs about sex. Because sexual orientation is a function of sex, this is simply impossible. Beliefs about sexual orientation necessarily take sex into consideration and, by extension, moral beliefs about sexual orientation are necessarily predicated, in some degree, on sex. For this reason, it makes no difference that the employer may not believe that its actions are based in sex. In Manhart , for example, the employer claimed its policy was based on longevity, not sex, but the Supreme Court concluded that, irrespective of the employer's belief, the longevity metric was predicated on assumptions about sex. 435 U.S. at 712-13, 98 S.Ct. 1370. The same can be said of sexual orientation discrimination.
To be clear, our conclusion that moral beliefs regarding sexual orientation are based on sex does not presuppose that those beliefs are necessarily animated by an invidious or evil motive. For purposes of Title VII, any belief that depends, even in part, on sex, is an impermissible basis for employment decisions.[22] This is true irrespective of whether the belief is grounded in fact, as in Manhart , id. at 704-05, 711, 98 S.Ct. 1370, or lacks "a malevolent motive," Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc. , 499 U.S. 187, 199, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). Indeed, in Johnson Controls , the Supreme Court concluded that an employer violated Title VII by excluding fertile women from jobs that involved exposure to high levels of lead, which can adversely affect the development of a fetus. 499 U.S. at 190, 200, 111 S.Ct. 1196. As the Court emphasized, "[t]he beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination" under Title VII. Id. at 200, 111 S.Ct. 1196. Here, because sexual orientation is a function of sex, beliefs about sexual orientation, including moral ones, are, in some measure, "because of ... sex."
*123 The government responds that, even if discrimination based on sexual orientation reflects a sex stereotype, it is not barred by Price Waterhouse because it treats women no worse than men.[23] Gov. Br. at 19-20. We believe the government has it backwards. Price Waterhouse , read in conjunction with Oncale , stands for the proposition that employers may not discriminate against women or men who fail to conform to conventional gender norms. See Oncale , 523 U.S. at 78, 118 S.Ct. 998 (holding that Title VII "protects men as well as women"); Price Waterhouse , 490 U.S. at 251, 109 S.Ct. 1775 ("We are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group."). It follows that the employer in Price Waterhouse could not have defended itself by claiming that it fired a gender-non-conforming man as well as a gender-non-conforming woman any more than it could persuasively argue that two wrongs make a right. To the contrary, this claim would merely be an admission that the employer has doubly violated Title VII by using gender stereotypes to discriminate against both men and women. By the same token, an employer who discriminates against employees based on assumptions about the gender to which the employees can or should be attracted has engaged in sex-discrimination irrespective of whether the employer uses a double-edged sword that cuts both men and women.[24]
*124 3. Associational Discrimination
The conclusion that sexual orientation discrimination is a subset of sex discrimination is further reinforced by viewing this issue through the lens of associational discrimination. Consistent with the nature of sexual orientation, in most contexts where an employer discriminates based on sexual orientation, the employer's decision is predicated on opposition to romantic association between particular sexes. For example, when an employer fires a gay man based on the belief that men should not be attracted to other men, the employer discriminates based on the employee's own sex. See Baldwin , 2015 WL 4397641, at *6.
This Court recognized associational discrimination as a violation of Title VII in Holcomb v. Iona College , 521 F.3d 130, 139 (2d Cir. 2008), a case involving allegations of racial discrimination. Holcomb, a white man, alleged that he was fired from his job as the assistant coach of a college basketball team because his employer disapproved of his marriage to a black woman. This Court concluded that Holcomb had stated a viable claim, holding that "an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race." Id. at 138. Although the Court considered the argument that the alleged discrimination was based on the race of Holcomb's wife rather than his own, it ultimately concluded that "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's own race." Id. at 139 ; see also Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists, 401 F.Supp. 1363, 1366 (S.D.N.Y. 1975) ("[I]f [plaintiff] was discharged because, as alleged, the defendant disapproved of a social relationship between a white woman and a black man, the plaintiff's race was as much a factor in the decision to fire her as that of her friend.").
Applying similar reasoning, the Fifth, Sixth, and Eleventh Circuits have reached the same conclusion in racial discrimination cases. See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc. , 173 F.3d 988, 994-95 (6th Cir. 1999) (holding that plaintiff had alleged discrimination where the employer was "charged with reacting adversely to [plaintiff] because of [his] race in relation to the race of his daughter"); Deffenbaugh-Williams v. Wal-Mart Stores, Inc. , 156 F.3d 581, 589 (5th Cir. 1998) ("[A] reasonable juror could find that [plaintiff] was discriminated against because of her race (white), if that discrimination was premised on the fact that she, a white person, had a relationship with a black person."), vacated in part on other grounds by Williams v. Wal-Mart Stores, Inc. , 182 F.3d 333 (5th Cir. 1999) (en banc); Parr v. Woodmen of the World Life Ins. Co. , 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of his race."). Other circuits have indicated that associational discrimination extends beyond race to all of Title VII's protected classes. See Hively , 853 F.3d at 349 (majority) (holding that Title VII prohibits associational discrimination on the basis of race as well as color, national origin, religion, and sex); Barrett v. Whirlpool Corp. , 556 F.3d 502, 512 (6th Cir. 2009) (stating, in the context of a race discrimination case, that "Title VII protects individuals *125 who, though not members of a protected class , are victims of discriminatory animus toward protected third persons with whom the individuals associate" (internal quotation marks omitted) (emphasis added) ).[25] We agree and we now hold that the prohibition on associational discrimination applies with equal force to all the classes protected by Title VII, including sex.
This conclusion is consistent with the text of Title VII, which "on its face treats each of the enumerated categories exactly the same" such that "principles ... announce[d]" with respect to sex discrimination "apply with equal force to discrimination based on race, religion, or national origin," and vice versa.[26] Price Waterhouse , 490 U.S. at 243 n.9, 109 S.Ct. 1775. It also accords with the Supreme Court's application of theories of discrimination developed in Title VII race discrimination cases to claims involving discrimination based on sex. See Meritor , 477 U.S. at 63-67, 106 S.Ct. 2399 (concluding that claims of hostile work environment, a theory of discrimination developed in the context of race, were equally applicable in the context of sex); see also William N. Eskridge, Jr., Title VII's Statutory History and the Sex Discrimination Argument for LGBT Workplace Protections , 127 Yale L.J. 322, 349 (2017) (explaining that the 1972 amendments to Title VII "repeatedly equated the evils of sex discrimination with those of race discrimination").
As was observed in Christiansen , "[p]utting aside romantic associations," the notion that employees should not be discriminated against because of their association with persons of a particular sex "is not controversial." 852 F.3d at 204 (Katzmann, C.J. , concurring). If an employer disapproves of close friendships among persons of opposite sexes and fires a female employee because she has male friends, the employee has been discriminated against because of her own sex. "Once we accept this premise, it makes little sense to carve out same-sex [romantic] relationships as an association to which these protections do not apply." Id. Applying the reasoning of Holcomb , if a male employee married to a man is terminated because his employer disapproves of same-sex marriage, the employee has suffered associational discrimination based on his own sex because "the fact that the employee is a man instead of a woman motivated the employer's discrimination against him." Baldwin , 2015 WL 4397641, at *6.
In this scenario, it is no defense that an employer requires both men and women to refrain from same-sex attraction or relationships. In Holcomb , for example, the white plaintiff was fired for his marriage to a black woman. See 521 F.3d at 138. If the facts of Holcomb had also involved a black employee fired for his marriage to a white woman, would we have said that because both the white employee *126 and black employee were fired for their marriages to people of different races, there was no discrimination "because of ... race"? Of course not.[27] It is unthinkable that "tak[ing] action against an employee because of the employee's association with a person of another race," id . at 139, would be excused because two employees of different races were both victims of an anti-miscegenation workplace policy. The same is true of discrimination based on sexual orientation.[28]
Although this conclusion can rest on its own merits, it is reinforced by the reasoning of Loving v. Virginia , 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). In Loving , the Commonwealth of Virginia argued that anti-miscegenation statutes did not violate the Equal Protection Clause because such statutes applied equally to white and black citizens. See id . at 7-8, 87 S.Ct. 1817. The Supreme Court disagreed, holding that "equal application" could not save the statute because it was based "upon distinctions drawn according to race." Id. at 10-11, 87 S.Ct. 1817. Constitutional cases like Loving "can provide helpful guidance in [the] statutory context" of Title VII. Ricci v. DeStefano , 557 U.S. 557, 582, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) ; see also Reva B. Siegel, She the People: The Nineteenth Amendment, Sex Equality, Federalism, and the Family , 115 Harv. L. Rev. 947, 949 (2002) (arguing that, in the constitutional context, "the Supreme Court developed the law of sex discrimination by means of an analogy between sex and race discrimination"). Accordingly, we find that Loving 's insight-that policies that distinguish according to protected characteristics cannot be saved by equal application-extends to association based on sex.
Certain amici supporting the defendants disagree, arguing that applying Holcomb and Loving to same-sex relationships is not warranted because anti-miscegenation policies are motivated by racism, while sexual orientation discrimination is not rooted in sexism. Although these amici offer no empirical support for this contention, amici supporting Zarda cite research suggesting that sexual orientation discrimination has deep misogynistic roots. See, e.g. , Andrew Koppelman, Why Discrimination Against Lesbians and Gay Men is Sex Discrimination , 69 N.Y.U. L. Rev. 197 (1994). But the Court need not resolve this dispute because the amici supporting defendants identify no cases indicating that the scope of Title VII's protection against sex discrimination is limited to discrimination motivated by what would colloquially be described as sexism. To the contrary, *127 this approach is squarely foreclosed by the Supreme Court's precedents. In Oncale , the Court explicitly rejected the argument that Title VII did not protect male employees from sexual harassment by male co-workers, holding that "Title VII's prohibition on discrimination 'because of ... sex' protects men as well as women" and extends to instances where the "plaintiff and the defendant ... are of the same sex." 523 U.S. at 78-79, 118 S.Ct. 998. This male-on-male harassment is well-outside the bounds of what is traditionally conceptualized as sexism. Similarly, as we have discussed, in Manhart the Court invalidated a pension scheme that required female employees to contribute more than their male counterparts because women generally live longer than men. 435 U.S. at 711, 98 S.Ct. 1370. Again, the Court reached this conclusion notwithstanding the fact that some people might not describe this policy as sexist. By extension, even if sexual orientation discrimination does not evince conventional notions of sexism, this is not a legitimate basis for concluding that it does not constitute discrimination "because of ... sex."[29]
The fallback position for those opposing the associational framework is that associational discrimination can be based only on acts-such as Holcomb's act of getting married-whereas sexual orientation is a status. As an initial matter, the Supreme Court has rejected arguments that would treat acts as separate from status in the context of sexual orientation. In Lawrence v. Texas , the state argued that its "sodomy law [did] not discriminate against homosexual persons," but "only against homosexual conduct." 539 U.S. 558, 583, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (O'Connor, J. , concurring). Justice O'Connor refuted this argument, reasoning that laws that target "homosexual conduct" are "an invitation to subject homosexual persons to discrimination." Id. More recently, in a First Amendment case addressing whether a public university could require student organizations to be open to all students, a religious student organization claimed that it should be permitted to exclude anyone who engaged in "unrepentant homosexual conduct," because such individuals were being excluded "on the basis of a conjunction of [their] conduct and [their] belief that the conduct is not wrong," not because of their sexual orientation. Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez , 561 U.S. 661, 672, 689, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010) (internal quotation marks omitted). Drawing on Lawrence and Bray v. Alexandria Women's Health Clinic , 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), a case brought under 42 U.S.C. § 1985(3), the Supreme Court rejected the invitation to treat discrimination based on acts as separate from discrimination based on status. Christian Legal Soc. , 561 U.S. at 689, 130 S.Ct. 2971 ; see also Bray , 506 U.S. at 270, 113 S.Ct. 753 (rejecting the act-status distinction by observing that "[a] tax on wearing yarmulkes is a tax on Jews"). Although amici 's argument inverts the previous defenses of policies targeting individuals attracted to persons of the same sex by arguing that Title VII's prohibition of associational discrimination protects only acts, not status, their proposed distinction is equally unavailing.
*128 More fundamentally, amici 's argument is an inaccurate characterization of associational discrimination. First, the source of the Title VII claim is not the employee's associational act but rather the employer's discrimination, which is motivated by "disapprov[al] of [a particular type of] association." See Holcomb , 521 F.3d at 139 ; see also 42 U.S.C. § 2000e-2(m) (asking whether the protected trait was "a motivating factor"). In addition, as it pertains to the employee, what is protected is not the employee's act but rather the employee's protected characteristic, which is a status. Holcomb , 521 F.3d at 139 ; Univ. of Tex. Sw. Med. Ctr. v. Nassar , 570 U.S. 338, 133 S.Ct. 2517, 2522, 186 L.Ed.2d 503 (2013) (defining "status-based discrimination," which is "prohibited by Title VII," as "discrimination on the basis of race, color, religion, sex, or national origin"). Accordingly, associational discrimination is not limited to acts; instead, as with all other violations of Title VII, associational discrimination runs afoul of the statute by making the employee's protected characteristic a motivating factor for an adverse employment action. See 42 U.S.C. § 2000e-2(m).[30]
In sum, we see no principled basis for recognizing a violation of Title VII for associational discrimination based on race but not on sex. Accordingly, we hold that sexual orientation discrimination, which is based on an employer's opposition to association between particular sexes and thereby discriminates against an employee based on their own sex, constitutes discrimination "because of ... sex." Therefore, it is no less repugnant to Title VII than anti-miscegenation policies.
C. Subsequent Legislative Developments
Although the conclusion that sexual orientation discrimination is a subset of sex discrimination follows naturally from existing Title VII doctrine, the amici supporting the defendants place substantial weight on subsequent legislative developments that they argue militate against interpreting "because of ... sex" to include sexual orientation discrimination.[31] Having carefully considered each of amici 's arguments, we find them unpersuasive.
First, the government points to the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991), arguing that this amendment to Title VII ratified judicial decisions construing discrimination "because of ... sex" as excluding sexual orientation discrimination. Among other things, the 1991 amendment expressly "codif[ied] the concepts of 'business necessity' and 'job related' " as articulated in Griggs , 401 U.S. at 429-31, 91 S.Ct. 849, and rejected the Supreme Court's prior decision on that topic in Wards Cove Packing Co. v. Atonio , 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). See Civil Rights Act of *129 1991 §§ 2(2), 3(2), 105 Stat. at 1071. According to the government, this amendment also implicitly ratified the decisions of the four courts of appeals that had, as of 1991, held that Title VII does not bar discrimination based on sexual orientation.
In advancing this argument, the government attempts to analogize the 1991 amendment to the Supreme Court's recent discussion of an amendment to the Fair Housing Act ("FHA"). In Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc. , the Court considered whether disparate-impact claims were cognizable under the FHA by looking to, inter alia , a 1988 amendment to the statute. --- U.S. ----, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015). The Court found it relevant that "all nine Courts of Appeals to have addressed the question" by 1988 "had concluded [that] the [FHA] encompassed disparate-impact claims." Id. at 2519. When concluding that Congress had implicitly ratified these holdings, the Court considered (1) the amendment's legislative history, which confirmed that "Congress was aware of this unanimous precedent," id ., and (2) the fact that the precedent was directly relevant to the amendment, which "included three exemptions from liability that assume the existence of disparate-impact claims," id. at 2520.
The statutory history of Title VII is markedly different. When we look at the 1991 amendment, we see no indication in the legislative history that Congress was aware of the circuit precedents identified by the government and, turning to the substance of the amendment, we have no reason to believe that the new provisions it enacted were in any way premised on or made assumptions about whether sexual orientation was protected by Title VII. It is also noteworthy that, when the statute was amended in 1991, only three of the thirteen courts of appeals had considered whether Title VII prohibited sexual orientation discrimination.[32] See Williamson , 876 F.2d 69 ; DeSantis v. PT&T Co ., 608 F.2d 327 (9th Cir. 1979) ; Blum , 597 F.2d 936. Mindful of this important context, this is not an instance where we can conclude that Congress was aware of, much less relied upon, the handful of Title VII cases discussing sexual orientation. Indeed, the inference suggested by the government is particularly suspect given that the text of the 1991 amendment emphasized that it was "respond[ing] to Supreme Court decisions by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." Civil Rights Act of 1991 §§ 2(2), 3(2), 105 Stat. at 1071 (emphasis added). For these reasons, we do not consider the 1991 amendment to have ratified the interpretation of Title VII as excluding sexual orientation discrimination.
Next, certain amici argue that by not enacting legislation expressly prohibiting sexual orientation discrimination in the workplace Congress has implicitly ratified decisions holding that sexual orientation was not covered by Title VII. According to the government's amicus brief, almost every Congress since 1974 has considered *130 such legislation but none of these bills became law.
This theory of ratification by silence is in direct tension with the Supreme Court's admonition that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," particularly when "it concerns, as it does here, a proposal that does not become law." Pension Benefit Guar. Corp. v. LTV Corp ., 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (citations and internal quotation marks omitted). This is because "[i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [a particular] statutory interpretation." Patterson v. McLean Credit Union , 491 (U.S. 164, 175 n.1, 109 S.Ct. 2363, 105 L.Ed.2d 132 1989) (internal quotation marks omitted). After all, "[t]here are many reasons Congress might not act on a decision ..., and most of them have nothing at all to do with Congress' desire to preserve the decision." Michigan v. Bay Mills Indian Cmty. , --- U.S. ----, 134 S.Ct. 2024, 2052, 188 L.Ed.2d 1071 (2014) (Thomas, J ., dissenting). For example, Congress may be unaware of or indifferent to the status quo, or it may be unable "to agree upon how to alter the status quo." Johnson v. Transp. Agency , 480 U.S. 616, 672, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (Scalia, J ., dissenting). These concerns ring true here. We do not know why Congress did not act and we are thus unable to choose among the various inferences that could be drawn from Congress's inaction on the bills identified by the government. See LTV Corp. , 496 U.S. at 659, 110 S.Ct. 2668 ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." (internal quotation marks omitted) ). Accordingly, we decline to assign congressional silence a meaning it will not bear.
Drawing on the dissent in Hively , the government also argues that Congress considers sexual orientation discrimination to be distinct from sex discrimination because it has expressly prohibited sexual orientation discrimination in certain statutes but not Title VII. See 853 F.3d at 363-64 (Sykes, J. , dissenting). While it is true that Congress has sometimes used the terms "sex" and "sexual orientation" separately, this observation is entitled to minimal weight in the context of Title VII.
The presumptions that terms are used consistently and that differences in terminology denote differences in meaning have the greatest force when the terms are used in "the same act." See Envtl. Def. v. Duke Energy Corp. , 549 U.S. 561, 574, 127 S.Ct. 1423, 167 L.Ed.2d 295 (2007). By contrast, when drafting separate statutes, Congress is far less likely to use terms consistently, see Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside-An Empirical Study of CongressionalDrafting, Delegation, and the Canons: Part I , 65 Stan. L. Rev. 901, 936 (2013), and these presumptions are entitled to less force where, as here, the government points to terms used in different statutes passed by different Congresses in different decades. See Violence Against Women Reauthorization Act of 2013, Pub L. No. 113-4, § 3(b)(4), 127 Stat. 54, 61 (2013); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 5306(a)(3), 124 Stat. 119, 626 (2010); Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, Pub. L. No. 111-84, §§ 4704(a)(1)(C), § 4704(a), 123 Stat. 2835, 2837, 2839 (2009); Higher Education Amendments of 1998, Pub. L. No. 105-244, § 486(e)(1)(A), 112 Stat. 1581, 1743 (1998).
*131 Moreover, insofar as the government argues that mention of "sexual orientation" elsewhere in the U.S. Code is evidence that "because of ... sex" should not be interpreted to include "sexual orientation," our race discrimination jurisprudence demonstrates that this is not dispositive. We have held that Title VII's prohibition on race discrimination encompasses discrimination on the basis of ethnicity, see Vill. of Freeport v. Barrella , 814 F.3d 594, 607 (2d Cir. 2016), notwithstanding the fact that other federal statutes now enumerate race and ethnicity separately, see, e.g ., 20 U.S.C. § 1092(f)(1)(F)(ii) ; 42 U.S.C. § 294e-1(b)(2). The same can be said of sex and sexual orientation because discrimination based on the former encompasses the latter.
In sum, nothing in the subsequent legislative history identified by the amici calls into question our conclusion that sexual orientation discrimination is a subset of sex discrimination and is thereby barred by Title VII.
III. Summary
Since 1964, the legal framework for evaluating Title VII claims has evolved substantially.[33] Under Manhart , traits that operate as a proxy for sex are an impermissible basis for disparate treatment of men and women. Under Price Waterhouse , discrimination on the basis of sex stereotypes is prohibited. Under Holcomb , building on Loving , it is unlawful to discriminate on the basis of an employee's association with persons of another race. Applying these precedents to sexual orientation discrimination, it is clear that there is "no justification in the statutory language ... for a categorical rule excluding" such claims from the reach of Title VII. Oncale , 523 U.S. at 80, 118 S.Ct. 998 ; see also Baldwin , 2015 WL 4397641, at *9 ("Interpreting the sex discrimination prohibition of Title VII to exclude coverage of lesbian, gay, or bisexual individuals who have experienced discrimination on the basis of sex inserts a limitation into the text that Congress has not included.").
Title VII's prohibition on sex discrimination applies to any practice in which sex is a motivating factor. 42 U.S.C. § 2000e-2(m). As explained above, sexual orientation discrimination is a subset of sex discrimination because sexual orientation is defined by one's sex in relation to the sex of those to whom one is attracted, making it impossible for an employer to discriminate on the basis of sexual orientation without taking sex into account. Sexual orientation discrimination is also based on assumptions or stereotypes about how members of a particular gender should be, including to whom they should be attracted. Finally, sexual orientation discrimination is associational discrimination because an adverse employment action that is motivated by the employer's opposition to association between members of particular sexes discriminates against an employee on the basis of sex. Each of these three perspectives is sufficient to support this Court's conclusion and together they amply demonstrate that sexual orientation *132 discrimination is a form of sex discrimination.
Although sexual orientation discrimination is "assuredly not the principal evil that Congress was concerned with when it enacted Title VII," "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils." Oncale , 523 U.S. at 80, 118 S.Ct. 998. In the context of Title VII, the statutory prohibition extends to all discrimination "because of ... sex" and sexual orientation discrimination is an actionable subset of sex discrimination. We overturn our prior precedents to the contrary to the extent they conflict with this ruling. See Simonton , 232 F.3d at 35 ; Dawson , 398 F.3d at 218-20.
***
Zarda has alleged that, by "honestly referr[ing] to his sexual orientation," he failed to "conform to the straight male macho stereotype." J.A. 72. For this reason, he has alleged a claim of discrimination of the kind we now hold cognizable under Title VII. The district court held that there was sufficient evidence of sexual orientation discrimination to survive summary judgment on Zarda's state law claims. Even though Zarda lost his state sexual orientation discrimination claim at trial, that result does not preclude him from prevailing on his federal claim because his state law claim was tried under "a higher standard of causation than required by Title VII." Zarda , 855 F.3d at 81. Thus, we hold that Zarda is entitled to bring a Title VII claim for discrimination based on sexual orientation.
CONCLUSION
Based on the foregoing, we VACATE the district court's judgment on the Title VII claim and REMAND for further proceedings consistent with this opinion. We AFFIRM the judgment of the district court in all other respects.

Zarda died in a BASE jumping accident after the district court awarded partial summary judgment but prior to trial on the remaining claims. The executors of his estate have been substituted as plaintiffs. Zarda and the executors of his estate are referred to collectively as "Zarda" throughout this opinion.

This opinion assumes arguendo that "sex" in Title VII "means biologically male or female," Hively v. Ivy Tech Cmty. Coll. of Ind. , 853 F.3d 339, 362 (7th Cir. 2017) (en banc) (Sykes, J ., dissenting), and uses the terms "sex" and "gender" interchangeably, as do the Supreme Court and other circuits cited herein.

The First Circuit has since qualified Higgins , holding that a plaintiff may "bring[ ] sex-plus claims under Title VII where, in addition to the sex-based charge, the 'plus' factor is the plaintiff's status as a gay or lesbian individual." Franchina v. City of Providence , 881 F.3d 32, 54 (1st Cir. 2018).

This Court has squarely held that failure to present a Title VII claim to the EEOC before filing suit in federal court "is not a jurisdictional prerequisite, but only a precondition to bringing a Title VII action that can be waived by the parties or the court." Francis v. City of New York , 235 F.3d 763, 768 (2d Cir. 2000) (alterations and internal quotation marks omitted).

The full quotation is, "I am not making this charge on the grounds that I was discriminated on the grounds of my sexual orientation. Rather, I am making this charge because, in addition to being discriminated against because of my sexual orientation, I was also discriminated against because of my gender." S.A. 3. Although inartful and perhaps even confusing, the best interpretation of this statement, read in the context of the entire charge, is that Zarda alleged that the sexual orientation discrimination he experienced was a subset of gender discrimination. Even if otherwise, the governing rule is that "[c]laims not raised in an EEOC complaint ... may be brought in federal court if they are reasonably related to the claim filed with the agency." Williams v. N.Y.C. Hous. Auth. , 458 F.3d 67, 70 (2d Cir. 2006) (internal quotation marks omitted). A claim is considered reasonably related if the alleged conduct "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." Id. (internal quotation marks omitted). Because Zarda's charge gave the Commission "adequate notice to investigate discrimination on both bases," it is irrelevant whether Zarda's EEOC complaint unequivocally alleged sexual orientation discrimination. Id. (internal quotation marks omitted).

Defendants' additional argument, which is that the executors of Zarda's estate lack standing to pursue this action, is premised on the representation that the sexual orientation claim under Title VII was not raised before the district court so the estate may not now raise that claim on the deceased plaintiff's behalf. Because we find that the sexual orientation claim was properly raised, we need not address this argument.

Importantly, Title VII protection does not hinge on whether sexual orientation discrimination is "synonymous with sex discrimination." Hively , 853 F.3d at 363 (Sykes, J. , dissenting). While synonyms are coextensive, sex discrimination obviously encompasses more than sexual orientation discrimination, including sexual harassment and other recognized subsets of sex discrimination.

The lead dissent rejects this "linguistic argument," Lynch, J. , Dissenting Op. at 148 (hereinafter "Lead Dissent"), and advocates that Title VII's prohibition must be understood in the context of the prejudices and popular movements animating national politics at the time the statute was enacted, particularly concerns about the sexual exploitation of women, id. at 142-48. But the dissent's account does not and cannot rebut the fact that sexual orientation is a sex-dependent trait.

Notably, the government concedes that "as a logical matter ... [y]ou could view sexual orientation as a subset of sex," however the government also insists that it could be "view[ed] ... as a distinct category." Oral Arg. Tr. at 53:17-20.

Lest there be any doubt, this Court's holding that sexual orientation discrimination is a subset of sex discrimination encompasses discrimination based on a person's attraction to people of the opposite sex, same sex, or both.

This holding is easily operationalized. A standard jury instruction in a Title VII case alleging sex discrimination informs the jury that a plaintiff has the burden of proving, by a preponderance of the evidence, that the defendant intentionally discriminated against the plaintiff because of sex, meaning that the plaintiff's sex was a motivating factor in the defendant's decision to take the alleged adverse employment action against the plaintiff. See 42 U.S.C. §§ 2000e-2(a)(1), 2000e-2(m). In a case alleging sexual orientation discrimination under Title VII, an instruction should add that "because of sex" includes actions taken because of sexual orientation.

Both the Department of Justice and the EEOC have filed amicus briefs in this case, the former in support of defendants and the latter in support of Zarda. Because EEOC attorneys represent only the Commission, 42 U.S.C. § 2000e-4(b)(2), while the Department of Justice has litigating authority on behalf of the United States, 28 U.S.C. § 517, this opinion refers to the Department of Justice as "the government."

The lead dissent trivializes the role of sex as a motivating factor by suggesting that an employer who discriminates on the basis of sexual orientation is merely "noticing" an employee's gender. Lead Dissent at 156. This argument, which implies that an employee's sexual orientation is the primary motivating factor while his or her sex is merely collateral, cannot be squared with the Supreme Court's case law. For example, in Manhart , the employer's argument that it was motivated by employee's life expectancy could not save its policy because, irrespective of the employer's intention or what it claimed to notice, life expectancy was a function of sex. 435 U.S. at 712-13, 98 S.Ct. 1370.

Ironically, the quoted language from Michael M. references instances where men and women are differently situated because of the discrimination borne by women-the fact that they are assigned parental responsibility at the moment an infant is born, are generally paid less than men, and are excluded from positions that are necessary for subsequent promotions. 450 U.S. at 469, 101 S.Ct. 1200 (collecting cases reflecting "the special problems of women" (internal quotation marks omitted) ). The Michael M. Court acknowledged that, when the sexes are not similarly situated because of discrimination, statutes may impose different standards in the interest of leveling the playing field. Id. However, Title VII commands equal treatment of sexes and neither the text of the statute nor Michael M. creates an exception permitting employers to engage in disparate treatment of men and women simply because they exhibit biological differences.

As alleged, Zarda's termination was plainly an adverse employment action that is covered by Title VII. See 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer ... to discharge ... any individual because of such individual's ... sex ....").

Arguably this approach is consistent with the Supreme Court's analysis in Oncale , which, after acknowledging that male-on-male harassment can be "because of ... sex," qualified that not all remarks with "sexual content or connotations" rise to the level of discrimination. 523 U.S. at 79-80, 118 S.Ct. 998.

The lead dissent argues that this conclusion is out of sync with precedents prohibiting sexual harassment and hostile work environments because, while those cases addressed particular employment "practice[s]," today's decision extends protection to "an entirely different category of people." Lead Dissent at 22. But "persons discriminated against based on sexual orientation" is no more a new category than "persons discriminated against based on gender stereotypes." In both instances, a man or woman is discriminated against based on a trait that is a function of sex and their claims fall squarely within the ambit of a well-recognized category: "persons discriminated against based on sex."

One amicus and the lead dissent interpret dicta in Price Waterhouse as establishing that sex stereotyping is discriminatory only when it pertains to traits that are required for the employee's job. See 490 U.S. at 251, 109 S.Ct. 1775 (observing that "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not"). We think this narrow reading is an inaccurate statement of Price Waterhouse , which did not indicate that stereotyping is impermissible only when the stereotyped trait is required for the plaintiff's job, and it is directly contradicted by Manhart 's holding that discriminating against women based on their longer life expectancy, which was certainly not an employment requirement, violated Title VII. 435 U.S. at 710-11, 98 S.Ct. 1370.

In this respect, discerning whether a stereotype is based on sex is closely aligned with the comparative test articulated in Manhart , which can illustrate both (1) whether a trait is a function of sex and (2) whether assumptions about that trait reflect a gender stereotype.

Some amici insist that stereotypes are mere evidence of discrimination and that stereotyping does not, by itself, constitute sex discrimination. Beyond establishing an adverse employment action, a Title VII plaintiff must always adduce evidence that an employer discriminated "because of" a protected trait and the Court agrees that sex stereotyping is legally relevant as "evidence that gender played a part" in a particular employment decision. Price Waterhouse , 490 U.S. at 251, 109 S.Ct. 1775 (emphasis omitted). But, Price Waterhouse 's reference to the evidentiary value of stereotyping in no way undercuts it conclusion that an employer may not "evaluate employees by assuming or insisting that they match[ ] the stereotype associated with their group." Id. And, just as the Supreme Court concluded that "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender," id. at 250, 109 S.Ct. 1775, this Court concludes that an employer who acts on the basis of a belief that an employee cannot or should not have a particular sexual orientation has acted on the basis of sex.

The Sixth Circuit has expressed the same observation, albeit in a decision declining to apply Price Waterhouse to sexual orientation discrimination. See Vickers v. Fairfield Med. Ctr. , 453 F.3d 757, 764 (6th Cir. 2006) ("[A]ll homosexuals, by definition, fail to conform to traditional gender norms in their sexual practices.").

We express no view on whether some exception, either under a different provision of Title VII or under the Religious Freedom Restoration Act, might immunize from liability discriminatory conduct rooted in religious beliefs.

The lead dissent offers a variation on this argument, reasoning that prescriptive views about sexual orientation rest not on "a belief about what men or women ought to be or do," but "a belief about what all people ought to be or do," Lead Dissent at 158, which is to say, a belief that all people should be attracted to the opposite sex. See also Hively , 853 F.3d at 370 (Sykes, J. , dissenting) ("To put the matter plainly, heterosexuality is not a female stereotype; it is not a male stereotype; it is not a sex-specific stereotype at all."). It invokes the same idea when it contends that sexual orientation discrimination is not a function of sex because it "does not differentially disadvantage employees or applicants of either sex." Lead Dissent at 152. We think the dissent goes astray by getting off on the wrong foot. The dissent views the "key element" as whether "one sex is systematically disadvantaged in a particular workplace." Id. at 158. But Title VII does not ask whether a particular sex is discriminated against; it asks whether a particular "individual " is discriminated against "because of such individual's ... sex." See 42 U.S.C. § 2000e-2(a)(1) (emphasis added); see also Manhart , 435 U.S. at 708, 98 S.Ct. 1370 ("The statute's focus on the individual is unambiguous."). Taking individuals as the unit of analysis, the question is not whether discrimination is borne only by men or only by women or even by both men and women; instead, the question is whether an individual is discriminated against because of his or her sex. And this means that a man and a woman are both entitled to protection from the same type of discrimination, provided that in each instance the discrimination is "because of such individual's ... sex." As we have endeavored to explain, sexual orientation discrimination is because of sex.

The Hively dissent also argued that sexual orientation discrimination is not a form of sex discrimination because it does not discriminate comprehensively within a sex. In particular, the dissent suggested that in cases where a fired lesbian employee was replaced by a heterosexual woman a jury would not be able to understand that sexual orientation discrimination is a subset of sex discrimination. See 853 F.3d at 373. We think that jurors are capable of understanding that an employer might discriminate against some members of a sex but not others. To wit, the intuitive principle that "Title VII does not permit the victim of [discrimination] to be told that he [or she] has not been wronged because other persons of his or her race or sex were hired" is well established in the law. Connecticut v. Teal , 457 U.S. 440, 455, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). By way of illustration, had the plaintiff in Price Waterhouse been denied a promotion while a gender-conforming woman was made a partner, this would have strengthened rather than weakened the plaintiff's case that she was discriminated against for failing to conform to sex stereotypes. We see no more difficulty with the concept that an employer cannot discriminate on the basis of sexual orientation than with the concept that one cannot discriminate based on an employee's gender non-conformity.

In addition, numerous district courts throughout the country have recognized that employers violate Title VII when they discriminate against employees on the basis of association with people of another national origin or sex, not only with people of another race. See, e.g. , Montes v. Cicero Pub. Sch. Dist. No. 99 , 141 F.Supp.3d 885, 900 (N.D. Ill. 2015) (national origin); Morales v. NYS Dep't of Labor , 865 F.Supp.2d 220, 242-43 (N.D.N.Y. 2012), aff'd , 530 Fed.Appx. 13 (2d Cir. 2013) (summary order) (race and national origin); Kauffman v. Maxim Healthcare Servs., Inc. , No. 04-CV-2869, 2006 WL 1983196, at *4 (E.D.N.Y. July 13, 2006) (sex and race); Reiter v. Ctr. Consol. Sch. Dist. No. 26-JT , 618 F.Supp. 1458, 1460 (D. Colo. 1985) (race and national origin).

The only exception, not relevant here, is for a "bona fide occupational qualification," which permits some differential treatment based on religion, sex, or national origin, but not based on race. 42 U.S.C. § 2000e-2(e).

Indeed, if this were the case, the white employee and the black employee would have cognizable Title VII claims. Cf. Hively , 853 F.3d at 359 n.2 (Flaum, J. , concurring) (noting that "even if an employer allegedly discriminates against all homosexual employees," the "employer's discrimination across sexes does not demonstrate that sex is irrelevant, but rather that each individual has a plausible sex-based discrimination claim" (emphasis added) ).

The lead dissent seeks to distinguish Holcomb by arguing that the employer in Holcomb was prejudiced against black people, whereas here the employer is "hostile to gay men, not men in general." Lead Dissent at 160. But, this distorts the comparison by misattributing the prejudice at issue in Holcomb . The basis of the Title VII claim in Holcomb was not the race of the plaintiff's wife; rather, the plaintiff, who was white, "suffer[ed] discrimination because of his own race" as a result of the employer's "disapprov[al] of interracial association." 521 F.3d at 139. Accordingly, the prejudice was not against all black people (or all white people) but against people marrying persons of a different race. That maps squarely onto this case where the prejudice is not against all men, but people being attracted to persons of the same sex.

To the extent that amici are arguing that racism and sexism are necessary elements of a Title VII claim because these beliefs are invidious or malicious, we think their contentions are misguided. Malice, which the Supreme Court has described as an "evil motive," is not required by Title VII, Kolstad v. Am. Dental Ass'n , 527 U.S. 526, 530, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) ; to the contrary, it is merely a basis on which an aggrieved employee may seek punitive damages, see 42 U.S.C. § 1981a(b)(1).

Because associational discrimination is premised on the employer's motivation and an employee's status, an associational discrimination claim does not require an act that consummates an association. For example, consider a scenario in which Holcomb had not been married to a black woman but merely expressed an interest in dating black women. If the employer terminated Holcomb merely on the basis of his desire to date black women, this would still be an instance "where an employee is subjected to adverse action because an employer disapproves of interracial association," and "the employee suffers discrimination because of the employee's own race." Holcomb , 521 F.3d at 139. The same is true in the context of sexual orientation.

Because "[t]he prohibition against discrimination based on sex was added to Title VII at the last minute on the floor of the House of Representatives," we have "little legislative history to guide us in interpreting" it. Meritor , 477 U.S. at 63-64, 106 S.Ct. 2399.

The fourth case cited by the government involved allegations of discrimination against a transgender individual, a distinct question not at issue here. See Ulane v. E. Airlines, Inc ., 742 F.2d 1081, 1084-87 (7th Cir. 1984). In addition, of the three cases actually on point, two predate Price Waterhouse , which was decided in May 1989, while the third was issued one month after Price Waterhouse but made no mention of it. Given that these cases did not have the opportunity to apply a relevant Supreme Court precedent, even if Congress was aware of them, there was reason for Congress to regard the weight of these cases with skepticism.

We also note that there has been a sea change in the constitutional framework governing same-sex marriage. See generally Obergefell v. Hodges , --- U.S. ----, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015) ; United States v. Windsor , 570 U.S. 744, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013). In the wake of this transformation, the intersection of the modern constitutional framework and decades-old precedents regarding sexual orientation discrimination under Title VII created a "paradoxical legal landscape" in which a man could exercise his constitutional right to marry his same-sex partner on Saturday and "then be fired on Monday for just that act." Hively , 830 F.3d at 714 (majority). This decision frees this circuit's jurisprudence regarding sexual orientation from that paradox.