# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
February 6, 2019

Lyle W. Cayce
Clerk

No. 18-20251

NICOLE C. WITTMER,

      Plaintiff - Appellant

v.

PHILLIPS 66 COMPANY,

      Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, ELROD, and HO, Circuit Judges.

JAMES C. HO, Circuit Judge:

Over the past two years, three circuits have construed Title VII of the Civil Rights Act of 1964 to prohibit employers from discriminating on the basis of either sexual orientation or transgender status. *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2nd Cir. 2018) (en banc); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) (en banc).

The district court here examined these recent out-of-circuit rulings, found them "persuasive," and thus "assume[d]" that Title VII prohibits transgender discrimination, in a published opinion. *Wittmer v. Phillips 66 Co.*, 304 F. Supp. 3d 627, 634 (S.D. Tex. 2018). In doing so, the district court expressly stated that "the Fifth Circuit has not yet addressed the issue." *Id.*

No. 18-20251

But we have addressed the issue. In *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979), we expressly held that Title VII does not prohibit discrimination on the basis of sexual orientation. Yet the district court did not mention, let alone distinguish, *Blum*. Most notably, it did not contend that Title VII applies to transgender status but not sexual orientation. To the contrary, the court concluded that the "same" analysis applies to transgender status and sexual orientation alike. *Wittmer*, 304 F. Supp. 3d at 634.

*Blum* remains binding precedent in this circuit to this day. Our sister circuits—including those favorably quoted in the district court's published opinion—recognize *Blum* as our precedent. *See Zarda*, 883 F.3d at 107–8 (recognizing historic "consensus among our sister circuits" foreclosing sexual orientation claims under Title VII, including *Blum*); *Hively*, 853 F.3d at 341–42 ("recognizing . . . Fifth Circuit's precedent in *Blum*"); *see also Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1255 (11th Cir. 2017) (*Blum* is "binding precedent" that "forecloses" sexual orientation discrimination claims under Title VII).

Other district courts within the Fifth Circuit have likewise repeatedly acknowledged that *Blum* is binding circuit precedent. *See, e.g., O'Daniel v. Indus. Serv. Solutions*, 2018 WL 265585, *7 (M.D. La. Jan. 2, 2018) ("The Fifth Circuit has specifically held that discharge based upon sexual orientation is not prohibited by Title VII . . . . *Blum* is binding precedent"); *Berghorn v. Texas Workforce Comm'n*, 2017 WL 5479592, *4 (N.D. Tex. Nov. 15, 2017) ("The court . . . is bound by Fifth Circuit precedent, not Seventh Circuit precedent.").

We nevertheless affirm the district court on other grounds. The district court correctly granted summary judgment for the employer, because the employee failed to present sufficient evidence to support a prima facie case of discrimination, and because the employee failed to present a genuine issue of material fact concerning pretext.

2

No. 18-20251

I.

Nicole Wittmer, a transgender woman, applied for an Instrument and Reliability Engineer position with Phillips 66 in 2015. Phillips 66 conducted four interviews, including an in-person interview on August 3.

During these interviews, Phillips 66 asked about Wittmer's current employment with Agrium. They discussed on-going projects at Agrium that would require significant future travel to Canada as the reason Wittmer was looking for a new job. On August 10, Phillips 66 offered Wittmer the job, contingent on passing certain background checks.

On September 2, Ellen Fulton, Phillips 66's Human Resources Manager, informed Wittmer that the background check uncovered a discrepancy: Agrium terminated Wittmer on July 28, with pay continuing through August 2.

In response, Wittmer acknowledged the discrepancy, but did not think "it was that big of a deal." Wittmer sent Fulton the July 28 termination letter from Agrium, clearly stating that their employment relationship ended on July 28.

Fulton and several other Phillips 66 executives conferred on September 8. Everyone at the meeting agreed that the offer of employment should be rescinded due to Wittmer's misrepresentations.

On September 10, Wittmer sent an unsolicited email to Fulton and another Phillips 66 employee, accusing them of transgender discrimination. Fulton responded that Phillips 66 was unaware of Wittmer's transgender status prior to the email, and that in any event, the information would not affect Phillips 66's decision.

On September 14, Fulton formally rescinded the offer of employment. Fulton explained that it was due to the discrepancies revealed during the background check after the initial conditional offer.

No. 18-20251

A year later, in October 2016, Wittmer filed a charge of discrimination with the EEOC against Phillips 66. Wittmer claimed that Phillips 66 rescinded its offer because of transgender discrimination. The EEOC issued a right-to-sue letter.

II.

Wittmer sued Phillips 66 under Title VII for discrimination on the basis of transgender status. Without distinguishing or even mentioning *Blum*, Wittmer claimed that Title VII prohibits transgender discrimination.

Phillips 66 took no position on whether Title VII prohibits transgender discrimination. Instead, Phillips 66 moved for summary judgment on the grounds that (1) Wittmer failed to state a prima face case of discrimination on the basis of transgender status, and (2) Wittmer failed to present a genuine issue of material fact that the non-discriminatory reason offered by Phillips 66 was pretextual.

The district court granted summary judgment to Phillips 66 on both grounds. Wittmer appealed.

On appeal, Phillips 66 continues to take no position on whether Title VII prohibits discrimination on the basis of transgender status. It instead seeks affirmance on the specific evidentiary grounds on which it prevailed in the district court.

This appeal nevertheless attracted substantial amicus attention on the question of whether Title VII prohibits transgender discrimination. The EEOC filed an amicus brief that took no position whether the judgment below should be affirmed or reversed. The EEOC simply asked this court to hold that Title VII does indeed prohibit discrimination on the basis of transgender status. Similarly, various organizations, led by the National Center for Lesbian Rights, filed an amicus brief that, like EEOC, concluded that Title VII prohibits transgender discrimination, and took no position on the judgment.

4

No. 18-20251

The EEOC requested the opportunity to participate in oral argument. We granted the request. In addition, we appointed Adam Mortara as amicus curiae to brief and argue the contrary interpretation of Title VII—just as the Second Circuit did in *Zarda*. The EEOC subsequently withdrew its request to participate in oral argument, due to the government shutdown. So the National Center amici asked us if they could take the EEOC's place at the podium. We granted that request as well.[1]

### III.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Title VII prohibits employment discrimination against "any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case of discrimination, the plaintiff must either present direct evidence of discrimination or, in the absence of direct evidence, rely on circumstantial evidence using the *McDonnell Douglas* burden-shifting analysis. Under *McDonnell Douglas*, the plaintiff carries the burden to prove that (1) he belongs to a protected class; (2) he applied for and was qualified for the position; (3) he was rejected despite being qualified; and (4) others similarly qualified but outside the protected class were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See also Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006).

If a plaintiff establishes a prima facie case, the burden shifts to the employer to show it had a legitimate, nondiscriminatory reason for rescinding

---

[1] We thank Mr. Mortara for his public service in accepting the court's appointment. We also thank the National Center amici for participating in oral argument under these unusual circumstances. All of the amici provided the court with excellent legal analysis and advocacy.

the offer.  *McDonnell Douglas*, 411 U.S. at 802.  If the employer can show a legitimate, non-discriminatory reason for not hiring the plaintiff, the presumption of discrimination disappears, and the burden shifts back to the plaintiff to show either that the proffered reason was a pretext for discrimination, or that the plaintiff's protected status was another motivating factor for the decision.  *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).  To overcome a legitimate, nondiscriminatory reason for termination, the plaintiff must show something beyond disagreement with the employer's decision.  *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Disparate treatment of similarly situated employees is one way to demonstrate unlawful discrimination and retaliation.").

Wittmer's claim fails at both steps.  To begin with, Wittmer failed to establish a prima facie case of discrimination.  Specifically, Wittmer did not present evidence that any non-transgender applicants were treated better, as required under the fourth prong of *McDonnell Douglas*.  *See Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408–09 (5th Cir. 2016) (upholding summary judgment for failing the fourth prong of the prima facie case).

In addition, Phillips 66 identified a legitimate, non-discriminatory reason for rescinding the offer—namely, Wittmer's misrepresentations. Wittmer's own deposition testimony confirms the misrepresentations about maintaining an on-going employment relationship with Agrium, and voluntarily departing Agrium to avoid substantial travel to Canada.  And Phillips 66 offered evidence that it decided to rescind the offer due to the discrepancies uncovered in the background check—and that it did so two days *before* anyone at the company ever learned of Wittmer's transgender status.

So Wittmer's claim fails for two reasons, separate and apart from our holding in *Blum*.  First, Wittmer failed to satisfy the plaintiff's burden to present a prima facie case under the fourth prong of *McDonnell Douglas*.  And

No. 18-20251

second, Wittmer did not present a genuine issue of material fact that the non-discriminatory reason offered by Phillips 66 was pretextual.  The district court was therefore correct to enter summary judgment for Phillips 66.

The judgment is affirmed.

No. 18-20251

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

I concur fully in the dismissal of Wittmer's Title VII claim on the grounds stated in the majority opinion. *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979), was decided decades before *Lawrence v. Texas*, 539 U.S. 558 (2003), invalidated laws criminalizing same-sex sexual conduct, and we have never since relied on *Blum* for its holding that Title VII does not cover sexual orientation discrimination. Neither party, in the district court or this court, relied on or questioned *Blum*'s continued vitality—so, wisely I think, we do not reach here to resolve *Blum*'s endurance or the question of whether Title VII today proscribes discrimination against someone because of sexual orientation or transgender status. We do not because we cannot, even with elegant asides.

No. 18-20251

JAMES C. HO, Circuit Judge, concurring:

For four decades, it has been the uniform law of the land, affirmed in eleven circuits, that Title VII of the 1964 Civil Rights Act prohibits sex discrimination—not sexual orientation or transgender discrimination.

But that uniformity no longer exists today. Three circuits to date have construed Title VII to prohibit sexual orientation or transgender discrimination. And now a district court in our circuit has issued a published opinion declaring those rulings "persuasive"—and thus the "assume[d]" law of our circuit—without mentioning our own circuit precedent to the contrary. *Wittmer v. Phillips 66 Co.*, 304 F. Supp. 3d 627, 634 (S.D. Tex. 2018).

The majority opinion makes plain what should go without saying—that our precedent remains binding in this circuit. I write separately to explain why our precedent is also correct as a matter of faithful legal interpretation. Only the Supreme Court can resolve this circuit split, of course. But because the EEOC has asked us to address this issue—and because the district court puts the law of our circuit into question—further discussion is warranted.

I.

Since 1964, Title VII has prohibited employers from "discriminat[ing]" against any individual with respect to employment "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

Whether this language applies to sexual orientation or transgender discrimination is a question of statutory interpretation that has deeply divided respected jurists in other circuits in recent years. *Compare, e.g., Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) (en banc); *id.* at 352 (Posner, J., concurring); *id.* at 357 (Flaum, J., concurring); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2nd Cir. 2018) (en banc); *id.* at 132 (Jacobs, J., concurring); *id.* at 135 (Cabranes, J., concurring); *id.* at 135 (Sack, J., concurring); *id.* at 136 (Lohier, J., concurring); *with Hively*, 853 F.3d at 359

9

(Sykes, J., dissenting); *Zarda*, 883 F.3d at 137 (Lynch, J., dissenting); *id.* at 167 (Livingston, J., dissenting); *id.* at 169 (Raggi, J., dissenting).

As a matter of ordinary usage, the term "sex," of course, does not mean "sexual orientation" or "transgender status." "In common, ordinary usage in 1964—and now, for that matter—the word 'sex' means biologically male or female . . . . To a fluent speaker of the English language—then and now—the ordinary meaning of the word 'sex' does not fairly include the concept of 'sexual orientation.' The two terms are never used interchangeably, and the latter is not subsumed within the former; there is no overlap in meaning." *Hively*, 853 F.3d at 362–63 (citations omitted) (Sykes, J., dissenting).

But what does it mean to "discriminate *because of* sex"? There are two competing schools of thought. Under the longstanding view, universally accepted by federal circuits for forty years, Title VII prohibits employers from favoring men over women, or vice versa. By contrast, under the approach recently adopted in three circuits, Title VII does more than prohibit favoritism toward men or women—it requires employers to be entirely blind to a person's sex. *See*, *e.g.*, *Hively*, 853 F.3d at 345 ("[H]olding all other things constant and changing only her sex, [would] she [] have been treated the same way?").

A brief example will illustrate the meaningful difference between these two visions. Separate bathrooms for men and women are of course ubiquitous in our society. They are prevalent not because they favor one sex over another, but because they protect the privacy of both sexes. So separate bathrooms are permitted under the anti-favoritism theory of Title VII. But they are unlawful under the blindness approach to Title VII, because separate bathrooms are obviously not blind to sex.

These competing visions of Title VII similarly diverge on the issue of transgender and sexual orientation discrimination. Imagine that a company discriminates against transgender women. Is that "discrimination *because of*

sex"?   The anti-favoritism theory would say no, not if the company also discriminates against transgender men.  After all, that would not be favoring men over women, or women over men—it would be favoring non-transgender persons over transgender persons.  So too as to sexual orientation:  A company that refuses to hire either gay men or lesbian women is not favoring men over women, or vice versa—it is favoring straight men and women over gay men and lesbian women.  The blindness theory, by contrast, would hold that Title VII prohibits both transgender and sexual orientation discrimination.  Because under that theory, it would not matter that the company isn't favoring men over women, or women over men.  All that matters is that company policy treats people differently based on their sex:  Because only women, not men, may identify as women—and only women, not men, may marry men—just as only women, not men, may use women's bathrooms.

Neither of these competing theories appears to be foreclosed under the literal terms of Title VII.  How, then, should a dutiful textualist proceed?  When statutory text permits two very different interpretations, how do you decide?  For a number of reasons, the traditional interpretation should prevail.

A.

Although judges in other circuits are divided over their interpretation of Title VII, they are united as to the original public meaning of Title VII.

No one seriously contends that, at the time of enactment, the public meaning and understanding of Title VII included sexual orientation or transgender discrimination.  To the contrary, there is a judicial consensus that the public meaning of Title VII in 1964 did not include sexual orientation or transgender discrimination.  *See, e.g.*, *Hively*, 853 F.3d at 345 (adopting interpretation of Title VII that "the Congress that enacted the Civil Rights Act in 1964 . . . may not have realized or understood"); *id.* at 355 (Posner, J., concurring) ("A broader understanding of the word 'sex' in Title VII than the

original understanding is thus required in order to be able to classify the discrimination of which Hively complains as a form of sex discrimination."); *id.* at 362 (Sykes, J., dissenting) ("Is it even remotely plausible that in 1964, when Title VII was adopted, a reasonable person competent in the English language would have understood that a law banning employment discrimination 'because of sex' also banned discrimination because of sexual orientation? The answer is no, of course not."); *Zarda*, 883 F.3d at 137 (Lynch, J., dissenting) ("Of course, today's majority does not contend that Congress literally prohibited sexual orientation discrimination in 1964. . . . [A]ny such contention would be indefensible.").[1]

This consensus about the original understanding of Title VII is further bolstered by four decades of case law. During that time, every federal circuit to address the issue—including the First through Eleventh Circuits—rejected attempts to construe Title VII to prohibit discrimination on the basis of either sexual orientation or transgender status. *See, e.g.*, *Dillon v. Frank*, 952 F.2d 403, *4 (6th Cir. 1992) (unpublished table) ("The circuits are unanimous in holding that Title VII does not proscribe discrimination based on sexual activities or orientation."); *Hively*, 853 F.3d at 361 (Sykes, J., dissenting) ("This interpretation has been stable for many decades and is broadly accepted; all

---

[1] Original public meaning is not to be confused with the subjective intent of legislators. Opponents of the traditional view of Title VII point out that members of Congress in 1964 would not have expected it to prohibit sexual harassment, including same-sex sexual harassment—yet that is how courts have construed it today. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998). But for originalists, the point is not whether members of Congress subjectively intended that result—rather, the point is whether they *should* have expected it, in light of the words of the statute as they were generally understood at the time. In short, our lodestar is original public meaning, not original intent. It should surprise no one that a statute drafted to eradicate sex discrimination in the workplace would later be unanimously construed by the Supreme Court to reach workplace conduct that pressures members of one sex out of the workplace, but not the other. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986). That of course says nothing about whether Title VII also forbids sexual orientation and transgender discrimination.

No. 18-20251

circuits agree that sexual-orientation discrimination is a distinct form of discrimination and is not synonymous with sex discrimination.").[2]

It was not until 40 years after Congress enacted Title VII that a federal court of appeals first construed it to prohibit transgender discrimination (*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004))—and 53 years after enactment that a federal court of appeals first construed it to prohibit sexual orientation discrimination (*Hively*, 853 F.3d 339).

If the first forty years of uniform circuit precedent nationwide somehow got the original understanding of Title VII wrong, no one has explained how.

B.

The traditional understanding of Title VII is further bolstered by other established principles of statutory interpretation.

---

[2] *See, e.g.*, *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999) ("[W]e regard it as settled law that . . . Title VII does not proscribe harassment simply because of sexual orientation."); *Simonton v. Runyon*, 232 F.3d 33, 35 (2nd Cir. 2000) ("The law is well-settled in this circuit and in all others to have reached the question that . . . Title VII does not prohibit harassment or discrimination because of sexual orientation."); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 261 (3rd Cir. 2001) ("It is clear . . . that Title VII does not prohibit discrimination based on sexual orientation."); *Wrightson v. Pizza Hut of Am.*, 99 F.3d 138, 143 (4th Cir. 1996) ("Title VII does not afford a cause of action for discrimination based upon sexual orientation."), *abrogated on other grounds by Oncale*, 523 U.S. 75; *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979) ("Discharge for homosexuality is not prohibited by Title VII."); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006) ("[S]exual orientation is not a prohibited basis for discriminatory acts under Title VII."); *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) ("While we recognize distinctions among homosexuals, transvestites, and transsexuals, we believe that the same reasons for holding that the first two groups do not enjoy Title VII coverage apply with equal force to deny protection for transsexuals."); *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989) ("Title VII does not prohibit discrimination against homosexuals."); *Sommers v. Budget Mktg, Inc.*, 667 F.2d 748, 750 (8th Cir. 1982) ("[D]iscrimination based on one's transsexualism does not fall within the protective purview of [Title VII]."); *DeSantis v. Pacific Tel. & Tel. Co.*, 608 F.2d 327, 329–30 (9th Cir. 1979) ("Title VII's prohibition of 'sex' discrimination applies only to discrimination on the basis of gender and should not be judicially extended to include sexual preference such as homosexuality."); *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 661 (9th Cir. 1977) ("Title VII does not embrace transsexual discrimination."); *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005) ("Title VII's protections . . . do not extend to harassment due to a person's sexuality."); *Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1255 (11th Cir. 2017) (following *Blum*).

No. 18-20251

As the Supreme Court has repeatedly observed, Congress "does not alter the fundamental details of a regulatory scheme in vague or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 468 (2001). *See also*, *e.g.*, *Gonzales v. Oregon,* 546 U.S. 243, 267 (2006) (same).

The Court typically invokes the "elephants" canon when it is asked to construe an ambiguous statute to reach a matter of great policy consequence. As the Court explained, Congress at times drafts statutes that are "susceptible to more precise definition and open to varying constructions, and thus ambiguous in the relevant sense." *Id.* at 258. When faced with such ambiguous provisions, "our inquiry into whether Congress has directly spoken to the precise question at issue is shaped, at least in some measure, *by the nature of the question presented.*" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (emphasis added). "Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration." *Id.*

For example, in *Gonzales v. Oregon*, the Court rejected an interpretation of the Controlled Substances Act that would have given the Attorney General the power to regulate drugs used in physician-assisted suicide. The Court noted that "[t]he importance of the issue of physician-assisted suicide, which has been the subject of an 'earnest and profound debate' across the country, makes the oblique form of the claimed delegation all the more suspect." 546 U.S. at 267 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997)).

Similarly, in *FDA v. Brown & Williamson*, the Court rejected a reading of the Food, Drug, and Cosmetic Act that would have given the FDA the power to regulate tobacco. The Court said that "we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." 529 U.S. at 160. *See also*

14

*MCI v. AT&T*, 512 U.S. 218, 231 (1994) ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements."); *Brannan v. Stark*, 342 U.S. 451, 463 (1952) ("We do not think it likely that Congress, in fashioning this intricate . . . machinery, would thus hang one of the main gears on the tail pipe.").

The elephants canon easily applies here. No one could seriously dispute the importance of the issues presented in this case, as reflected by the amicus and en banc attention these issues have attracted in other circuits.

What's more, this case is about more than sexual orientation or transgender discrimination. If we accept the blindness theory of Title VII, what else are employers prohibited from doing?

As I noted earlier, employers would also be forbidden from maintaining separate bathrooms and changing rooms for men and women—even though the purpose of separate bathrooms and changing rooms is not favoritism toward either sex, but respect for the privacy of employees and customers of both sexes. No one to my knowledge has suggested how the blindness theory of Title VII could prohibit transgender and sexual orientation discrimination, while still allowing employers to maintain separate bathrooms for men and women. That is presumably because no such limiting principle exists.

In *Zarda*, for example, Judge Lynch stated that surely "Title VII . . . does not prohibit an employer from having separate men's and women's toilet facilities." 883 F.3d at 150 (Lynch, J., dissenting). Indeed, it was precisely for that reason that he rejected the blindness view of Title VII. *See id.* at 151 ("it is not the case that any employment practice that can only be applied by identifying an employee's sex is prohibited," including separate bathrooms).

No. 18-20251

Notably, the majority in *Zarda* responded to Judge Lynch by conceding that, under their view of Title VII, "employer policies regarding sex-segregated bathrooms" would indeed "discriminate[] because of sex." *Id.* at 118. The majority tried to avoid employer liability for separate bathrooms by suggesting that bathroom assignments are not significant enough to constitute terms and conditions of employment protected under Title VII. *Id.* at 118–19. But that only begs the question: What if an employee is fired for using the wrong bathroom or changing room? The majority does not say.

To their credit, the National Center amici conceded during oral argument that, under their theory of Title VII, employers would indeed be forbidden from maintaining separate bathrooms and changing rooms for men and women. Oral Arg. 27:40–28:17.

So this case does not simply concern sexual orientation and transgender discrimination. It affects every American who uses the restroom at any restaurant, buys clothes at any department store, or exercises at any gym. What's more, because federal statutes governing educational institutions employ language indistinguishable from Title VII, this debate also affects virtually every school, college, dormitory, athletic activity, and locker room in America. *See, e.g.*, Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.").

Under the elephants canon, significant policy issues must be decided by the people, through their elected representatives in Congress, using clearly understood text—not by judges, using "oblique," "cryptic," or "subtle" statutory parsing. *Gonzales*, 546 U.S. at 267; *Brown & Williamson*, 529 U.S. at 160; *MCI*, 512 U.S. at 231. That principle surely applies here, considering the

16

revolutionary social change that would be brought about under the blindness approach to Title VII.

C.

The traditional interpretation of Title VII is also the only reading that comports with common usage.

When construing statutes, courts presume that lawmakers use words in light of their natural and ordinary meaning, rather than resort to more cryptic formulations. *See*, *e.g.*, *Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").

If Congress had meant to prohibit sexual orientation or transgender discrimination, surely the most straightforward way to do so would have been to say so—to add "sexual orientation" or "transgender status" or "gender identity" to the list of classifications protected under Title VII. It would defy common sense to imagine that lawmakers labored to assemble a majority coalition to eradicate sexual orientation and transgender discrimination from the workplace—only to select the most oblique formulation they could think of ("because of sex") and then hope for the best that courts would understand what they meant.

By the same token, any legitimate theory of interpretation must account for the possibility that lawmakers might ultimately decide to prohibit sex discrimination, but not sexual orientation or transgender discrimination. And the most obvious way to implement that policy judgment is to do exactly what Congress did in 1964: prohibit discrimination on the basis of sex, without the need for an exemption for, or any other reference to, sexual orientation or transgender status.

This is not just common usage in 1964—it is common usage today. Counsel for the National Center amici acknowledged as much during oral

No. 18-20251

argument. When asked about a hypothetical company that hires equally between men and women, but refuses to hire any transgender men or women, counsel agreed that, as a matter of common parlance, we would call that company today transphobic, not sexist. Oral Arg. 25:10–25:35.

Similarly, both Congress and various state legislatures have expressly prohibited sexual orientation and gender identity discrimination by using the terms "sexual orientation" and "gender identity," as Judge Sykes cataloged in *Hively*. 853 F.3d at 363–64 (Sykes, J., dissenting). "This uniformity of usage is powerful objective evidence that sexual-orientation discrimination is broadly recognized as an independent category of discrimination and is *not* synonymous with sex discrimination." *Id.* at 364–65.[3]

## II.

Opponents of the traditional approach to Title VII nevertheless contend that their position is compelled by the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See, e.g., Hively*, 853 F.3d at 342.

Under this theory, sex stereotyping is *per se* unlawful under *Price Waterhouse*, regardless of whether it is ultimately used to favor one sex over another. Accordingly, transgender discrimination must now be treated as *per se* unlawful under Title VII as well. After all, transgender discrimination targets transgender men and women precisely because they do not conform with sex stereotypes as to how they should identify themselves. And so too with sexual orientation discrimination, which likewise targets gay men and

---

[3] *See, e.g.*, Violence Against Women Act, 34 U.S.C. § 2291(b)(13)(A) (prohibits federally funded programs and activities from discriminating "on the basis of actual or perceived race, color, religion, national origin, sex, gender identity, . . . sexual orientation, or disability"); Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, 18 U.S.C. § 249(a)(2)(A) (imposes heightened punishment for causing or attempting to cause bodily injury "to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person").

lesbian women because they do not conform with sex stereotypes. *See, e.g., id.* ("[A]ll gay, lesbian and bisexual persons fail to comply with the sine qua non of gender stereotypes—that all men should form intimate relationships only with women, and all women should form intimate relationships only with men.").

But here's the problem with this theory: *Price Waterhouse* doesn't make sex stereotyping *per se* unlawful under Title VII. To the contrary, under *Price Waterhouse*, sex stereotyping is actionable only to the extent it provides evidence of favoritism of one sex over the other.

The plurality opinion of Justice Brennan, for example, spoke of prohibiting not all sex stereotypes *per se*, but only "*disparate treatment* of men and women *resulting from sex stereotypes*." *Id.* at 251 (emphasis added). *See also id.* ("An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind.") (citations and quotations omitted).

Similarly, the concurring opinion of Justice O'Connor observed that sex is a "human characteristic[] of which decisionmakers are aware and about which they may comment in a *perfectly neutral and nondiscriminatory fashion*." *Id.* at 277 (emphasis added). "What is required is . . . direct evidence that decisionmakers placed *substantial negative reliance* on an illegitimate criterion in reaching their decision." *Id.*

And Justice Kennedy noted on behalf of three dissenting justices that "Title VII creates no independent cause of action for sex stereotyping. Evidence of use by decisionmakers of sex stereotypes is, of course, quite relevant to the question of discriminatory intent. The ultimate question, however, is whether discrimination caused the plaintiff's harm." *Id.* at 294.

No. 18-20251

III.

Opponents of the traditional view of Title VII also claim their position is compelled by an analogy to race, and specifically, to interracial marriage.

Put simply, their point is this: Title VII requires blindness to race—so why doesn't it also require blindness to sex? For example, courts have construed Title VII to forbid employers from discriminating against employees for being in an interracial marriage. *See, e.g., Holcomb v. Iona College*, 521 F.3d 130 (2nd Cir. 2008); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888 (11th Cir. 1986). Why, then, doesn't Title VII also require employers to be blind to sex as well—which would prohibit discrimination on the basis of same-sex marriage, sexual orientation, and transgender status? *See, e.g., Hively*, 853 F.3d at 342 (alleging "sharp tension" between lack of Title VII protection for sexual orientation and legal protection for interracial marriage).

But the analogy fails for one simple reason: The Supreme Court has analyzed interracial marriage differently from same sex marriage.

The Court has condemned laws against interracial marriage, not only because of our constitutional commitment to color blindness, but because prohibitions on interracial marriage are racist, pure and simple. As the Court put it, "[t]here is patently no legitimate overriding purpose independent of *invidious racial discrimination* which justifies this classification." *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (emphasis added). *See also Hively*, 853 F.3d at 348 ("[M]iscegenation laws . . . are (and always were) inherently racist."); *id.* at 368 (Sykes, J., dissenting) ("[M]iscegenation laws are inherently racist.").

By contrast, the Court did not establish a right to same-sex marriage based on sex discrimination *at all*, let alone based on blindness to sex. To be sure, the plaintiffs in *Obergefell* made the argument—indeed, they devoted an entire subsection of their brief to the argument that traditional marriage laws are not blind to sex. Brief for Petitioners, *Obergefell v. Hodges*, 135 S. Ct. 2584

20

No. 18-20251

(2015), *available at* 2015 WL 860738, *48. Yet not a single justice endorsed that theory. Instead, the Supreme Court held that traditional marriage laws discriminate on the basis of sexual orientation, not sex. As Judge Sykes put it in *Hively*, "far from collapsing the well-understood distinction between sex discrimination and sexual-orientation discrimination, the Court actually preserved it." 853 F.3d at 372 (Sykes, J., dissenting).

IV.

It took an act of Congress to prohibit race and sex discrimination in private employment nationwide—a landmark achievement in our nation's history. So too it will take an act of Congress if the people wish to prohibit transgender and sexual orientation discrimination across the country as well. *See*, *e.g.*, *Zarda*, 883 F.3d at 166 (Lynch, J., dissenting) ("[I]t is the prerogative of Congress or a state legislature to decide whether private employers may [discriminate].").

Running the gauntlet of Article I, Section 7 of the Constitution is arduous work, to be sure. But it is necessary for the people to ensure that the protections sought in this case are not just legitimate, but lasting.

Moreover, it is worth remembering what Congress has already achieved by enacting the 1964 Civil Rights Act. As the court-appointed amici reminds us: Title VII protects every American, regardless of sexual orientation or transgender status. It simply requires proof of sex discrimination, as distinct from sexual orientation or transgender discrimination. If you can demonstrate that your employer will hire transgender men but not transgender women, or gay men but not lesbian women, or vice versa, you may well have a claim of sex discrimination.

In sum, Title VII prohibits sex discrimination, full stop. And it applies the same rules to everyone, without regard to sexual orientation or transgender status. For example, in *O'Daniel v. Industrial Service Solutions*,

No. 18-20251

2018 WL 265585, *7 (M.D. La. Jan. 2, 2018) (appeal pending), the district court held that a straight employee has no Title VII claim for sexual orientation discrimination by a lesbian supervisor. *See also Medina*, 413 F.3d at 1133–35 (same). The same rules apply to Bonnie O'Daniel as to Nicole Wittmer.

\* \* \*

Under our Constitution, contentious policy disputes are resolved by the people, through their elected representatives in Congress. And when a particular policy position garners enough support to leap the hurdles of Article I, Section 7, it becomes the law of the land.

For our system to work, however, we must share a common language. When the American people come to a consensus, there must be a way to reduce the agreement to words that we can all understand and accept—both today and in the years to come. We must have confidence that our words will be faithfully construed in the future, consistent with our common understanding.

That confidence is lost if the people undertake to debate difficult issues, accept the daunting task of forging compromise, and then reduce that compromise to legislation—only to have courts surprise the people with rulings that bear no resemblance to our common language. I agree with Judge Lynch that "we need to respect the choices made by Congress about which social problems to address, and how to address them." *Zarda*, 883 F.3d at 166 (Lynch, J., dissenting). We should not "impos[e] on a half-century-old statute a meaning of 'sex discrimination' that the Congress that enacted it would not have accepted." *Hively*, 853 F.3d at 357 (Posner, J., concurring).

I join in the decision to affirm the district court. But I do so with concern that the people are losing faith in their institutions—and that our courts are giving the people reason to do so.